Michael John **BELL**, Petitioner,

v.

Wayne K. **PATTERSON**, Respondent.

Civ. A. No. 67–C–458.

United States District Court
D. Colorado.

Feb. 12, 1968.

Rollie R. Rogers, Denver, Colo., for petitioner.

Duke W. Dunbar, Atty. Gen. for State of Colorado, Paul D. Rubner, Asst. Atty. Gen., Denver, Colo., for respondent.

## MEMORANDUM OPINION AND ORDER

WILLIAM E. DOYLE, District Judge.

The action comes before the Court on a petition for relief under 28 U.S.C. § 2254. When a matter is thus presented the mentioned act of Congress contemplates that a United States court will

search the record carefully and in depth. This we have attempted to do.

Petitioner was convicted of first degree murder in Denver, Colorado District Court on June 12, 1963, and subsequently sentenced to death. Petitioner contends that his conviction and sentence violated certain rights guaranteed to him under the U. S. Constitution. With certain minor exceptions noted below, it is agreed by the parties that petitioner has exhausted the state remedies available to him as required by 28 U.S.C. § 2254(b).

There have been two hearings in this Court. The first was held to deal with the legal issues. Subsequently it appeared that there were some evidentiary disputes. Thereafter, witnesses were heard for the purpose of resolving these matters. The cause now stands submitted.

### Voluntariness of Petitioner's Confession

■■ Petitioner asserts that his confession introduced in the Denver District Court murder trial (Crim. No. 50233; May 27—June 12, 1963) was involuntary, and he therefore contends that its admission as evidence violated his right against self-incrimination protected from state infringement by the Fourteenth Amendment. We note at the outset that since petitioner's trial took place in May 1963, any failure of Denver police officers to follow procedures expostulated in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L. Ed.2d 977 (1964) and finally in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) does not automatically require exclusion of the contested confession, though any variation from these procedures may still be significant in assessing the voluntariness of the confession. Johnson v. State of New Jersey, 384 U.S. 719, 730, 86 S. Ct. 1772, 16 L.Ed.2d 882 (1966).

The events surrounding petitioner Bell's apprehension and subsequent interrogation culminating in the confession are pertinent to a decision as to voluntariness. On September 12, 1962, Denver patrolman Carl Knobbe was shot to death while trying to apprehend a robbery suspect, who later proved to be petitioner. After a city-wide manhunt was instituted to search for Knobbe's assailant, petitioner Bell was apprehended on September 13 at 5:55 A.M. by patrolman Kenneth Pennel who was shortly joined by patrolman Paul Holland.

Pennel and Holland took Bell to Denver Police headquarters, arriving there at about 6:30 A.M. Bell was held in a third-floor office of the building until about 7:00 A.M., when Division Chief James Shumate, assisted by other police officers, began interrogating him. The interrogation lasted until about 7:55 A. M., at which time a reporter took down the statement and later transcribed it. This was an acknowledgment of guilt.

Petitioner was formally booked at 8:30 A.M., and between 8:30 and 10:15 A.M. he was photographed in the identification bureau, issued prison clothing, and given something to eat. At 10:15 A.M. petitioner was returned to Chief Shumate's office, where he read and signed his statement, making certain corrections thereon. At 10:50 A.M. petitioner was taken before a magistrate in the same building, where he was formally advised of his rights.

At the Denver District Court trial, counsel had objected to admission of Bell's confession on grounds that it was involuntary. The trial judge heard evidence on the question of voluntariness out of the presence of the jury. During that *in camera* hearing petitioner made several specific allegations:

1. After he was arrested and taken to police headquarters, he was told by an unidentified detective that he would be held incommunicado until he gave a statement.

2. Before Chief Shumate arrived, petitioner stated that he wanted to see an attorney and did not want to make any statement. At that point an unidentified detective drew his pistol, and

patting it with his hand stated that while Bell had his rights the police had certain rights too. The detective supposedly further threatened that Bell would be shot in a staged escape attempt if he refused to give a statement. Bell stated that these alleged threats, made in Chief Shumate's office before Shumate arrived, were his only reason for giving the confession.

The only other witness testifying at the *in camera* hearing on the question of voluntariness was Chief Shumate. Shumate stated that he had arrived and begun questioning Bell shortly after 7:00 A.M.; that he talked with him about one-half hour; and that Bell gave his statement shortly before 8:00 A.M. During this period Shumate did not recall Bell requesting to see an attorney. According to Shumate no threats, promises, coercion, or duress were used against Bell during this interrogation, and specifically no guns were drawn or flourished. (Shumate's previous testimony in open court was that he had warned Bell that anything he said could be used against him.)

At the conclusion of this hearing the trial judge made certain findings:

1. He held that Bell was taken before a magistrate within a reasonable time, particularly in view of the fact that Bell first made his statement to the police shortly before 8:00 A.M., less than an hour after his interrogation had begun and before the court felt a magistrate was available.

2. Bell had been advised of his rights by Chief Shumate, particularly that anything he said might be used against him as evidence.

3. The trial judge chose not to believe Bell's testimony concerning the threats allegedly made against him before Shumate's arrival. Bell's failure to mention such threats, if any, to Shumate once Shumate arrived further evidenced that no such duress had been present.

The trial judge therefore ruled that the confession was admissible as evidence.

While the trial judge refused to believe petitioner's allegations of threats made against him, no direct evidence had been presented at the *in camera* hearing to counter these allegations. The sole testimony in opposition to Bell's account was that of Chief Shumate, who was not present when the threats were supposedly made. Accordingly, on January 19, 1968, this Court held the evidentiary hearing referred to above, to ascertain the facts occurring on September 13, 1962, during the time period between Bell's capture at 5:55 A.M. and the beginning of Shumate's interrogation of Bell shortly after 7:00 A.M.

Petitioner presented no additional evidence at this hearing since his testimony given at his 1963 trial was already before the Court. Respondent's evidence presented at the hearing consisted of the testimony of officers Kenneth Pennel and Paul Holland, the two policemen who arrested Bell on the morning of September 13, 1962. The testimony of these two officers was substantially similar. Officer Pennel made the initial arrest of Bell and was joined in about one to one and one-half minutes by officer Holland. The two officers took Bell to Denver Police Station, arriving there at about 6:30 A.M. Both officers testified that Bell did not request an attorney during this ride; that he was not told he would be held incommunicado; and that no other threats were made to Bell during the ride. Aside from one question put to Bell by officer Holland relating to where Bell had spent the previous night, there was no interrogation during the ride.

Upon arriving at the police station at about 6:30 A.M., Bell was taken by the two officers to Chief Shumate's office, where the officers remained with Bell until Shumate arrived to begin questioning. During this period the three men sat in the office with the door open. Pennel testified that he did not recall anyone questioning Bell, either plainclothes policemen or anyone else, until Shumate arrived. Holland testified that although several persons might have

looked in the open door at Bell, no one questioned him before the arrival of Shumate. Specifically, both officers testified that Bell was not threatened that he would be held incommunicado; that no guns were patted or flourished; that no threats to Bell's life were made; and that no other implied threats were made. Indeed, there was no consequential communication between Bell and the officers.

 Supplemented by the testimony presented at this January 19, 1968 evidentiary hearing, the trial court's determination that petitioner's confession was voluntary must be sustained. Under 28 U.S.C. § 2254(d), as recently amended, this Court's role with regard to factual determinations made by a state court is a limited one. Under most conditions a presumption of correctness buttresses the trial court's factual determination. Nothing brought to the attention of this Court either through arguments of counsel or through the recent evidentiary hearing effectively rebuts that presumption.

The presumption of correctness aside, the facts surrounding Bell's confession established that the trial court's ruling was sound. Bell had been the object of a city-wide manhunt for one and one-half days. He was well aware that he was being sought. When finally apprehended, the atmosphere was such as to suggest that he realized his flight from the law had come to an end and that further avenues of escape were closed. He was taken directly to police headquarters, and upon commencement of interrogation his disclosure of the events in question was rapid. He had given a complete statement in less than one hour. Two hours later he made corrections to the prepared statement and signed it. This does not strike us as a fact situation in which the police coerced petitioner until his will to resist was overcome. Rather it appears that petitioner was resigned to the fact

of his own guilt, and having been apprehended was psychologically ready to confess. Petitioner's statement thus stemmed from the apparent futility of his own situation rather than from any coercive activities of the police. Such a confession cannot be categorized as involuntary. We hold then that the confession was virtually spontaneous; that it was a free will offering and was therefore admissible.

### Whether the Death Penalty is Cruel and Unusual Punishment

Pursuant to C.R.S. 1963, 39–11–3, the jury sentenced Bell to death on August 20, 1963. His attorneys contend that the death penalty is violative of the prohibition against cruel and unusual punishment contained in the Eighth Amendment to the Federal Constitution.[1]

██ There is no longer a question whether the Eighth Amendment is applicable to the states through the Fourteenth Amendment. Robinson v. State of California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). However, in State of Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947), the Supreme Court held that the death penalty violated no constitutional prohibitions:

"The cruelty against which the Constitution protects a convicted man is cruelty inherent in the method of punishment, not the necessary suffering involved in any method humanely employed to extinguish life humanely." 329 U.S. at page 464, 67 S.Ct. at page 376.

See also, Ex Parte Medley, 134 U.S. 160, 10 S.Ct. 384, 33 L.Ed. 835 (1889) (hanging); and Wilkerson v. Utah, 99 U.S. 130, 25 L.Ed. 345 (1878) (firing squad).

In Weems v. United States, 217 U.S. 349, 30 S. Ct. 544, 54 L.Ed. 793 (1909), the Supreme Court rejected a static interpretation of the Eighth Amendment by

---

1. Petitioner also argues that it is cruel and unusual punishment to subject him to the mental anguish of continuous appeals and stays of execution. This argu-

ment is self-defeating in that the stays have been granted as a result of his efforts to avoid the death penalty.

holding that its prohibition is not limited to punishments which would have been cruel and unusual in the seventeenth and eighteenth centuries:

"Time works changes, brings into existence new conditions and purposes. * * * In the application of a constitution, therefore, our contemplation cannot be only of what has been but of what may be." 217 U.S. at page 373, 30 S.Ct. at page 551.

A similar ruling was made in the more recent case of Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1957), where the Supreme Court held that the use of denationalization as a punishment violated the Eighth Amendment:

"The words of the Amendment are not precise, and * * * their scope is not static. The Amendment must draw its meaning from the evolving standards of decency, that mark the progress of a maturing society * *. The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. While the state has power to punish, the Amendment stands to assure that this power be exercised within the limits of civilized standards." 356 U.S. at 100–101, 78 S.Ct. 597–598.

■ The decisions upholding the validity of the death penalty have not been overruled or even determined. Hence the law of the land as of the present moment is that the death penalty does not violate the Constitution of the United States. Petitioner's contention is therefore without merit.

*Whether Jury Sentencing Deprived Petitioner of Any Constitutional Rights*

■ None of petitioner's arguments on jury sentencing have been presented to the state court either on direct appeal or in collateral proceedings. These exact issues have been presented however to the Colorado Supreme Court in Segura v. People (Colo.S.Ct.1967), 431 P.2d 768. The Court rejected the arguments on the merits. It is highly prob-

able that further attempts by petitioner to gain relief on these grounds would meet the same fate and therefore there has been practical exhaustion of state remedies. Garton v. Tinsley, 171 F.Supp. 387 (D.Colo.1959).

■■ Petitioner's first objection to jury sentencing is that it deprived him of due process by interfering with the presentation of mitigating evidence which would have been contained in a pre-sentence report to a judge. The right to a pre-sentence report has not been heretofore recognized as a constitutional right. See, e. g., United States ex rel. Dukes v. Sain, 297 F.2d 799 (7th Cir. 1963), and United States ex rel. Witherspoon v. Ogilvie, 337 F.2d 427 (7th Cir. 1964). The only restriction suffered was on the kind of hearsay and opinion evidence which is available in a typical pre-sentence report. At the same time, petitioner could have presented competent and relevant evidence to establish mitigating circumstances and, indeed, the record shows that this was done extensively at the trial. Thus, we see nothing which suggests that petitioner suffered special prejudice and there is no merit in the contention that such procedure is *per se* an infringement. In fact, it has been suggested by a noted authority on corrections that this is a mitigation of capital punishment:

"[T]hese statutes [allowing the jury a choice between the death penalty and a life term] are basically a mitigation of the capital penalty rather than a reflection of the orientation which gives general sentencing power to juries. The general criticism of jury sentencing is not applicable to this discretion of the jury. Like jurors in eighteenth century England, who frequently refused to convict in capital cases, we grasp at any means to lessen use of the death penalty." Rubin, The Law of Criminal Correction 325 (1963).

■ Petitioner's second argument is that jury sentencing violates due process because it invades the province of the judge. The jury is generally con-

sidered a temporizing force in the administration of justice in that it can and does give effect to equitable and mitigating factors which a court feels duty bound to ignore. Deprivation of full-scale jury trial is often the complaint; hence, it is surprising to hear petitioner complain that he was deprived of a hearing by a judge and was subjected to a jury trial. We see no merit in the argument. Cf. Wyley v. Warden, Maryland Penitentiary, 372 F.2d 742 (4th Cir. 1967).[2]

 Petitioner also argues that jury sentencing violates due process because it is carried out without proper standards and cannot be supervised or reviewed. However, this is not a constitutional requirement. If standards and review were required, *judicial* sentencing as it now exists would also be unconstitutional. In Re Ernst's Petition, 294 F.2d 556, 560–561 (3rd Cir. 1961).

 A further argument is that Colorado's jury sentencing procedure deprived the petitioner of his right against self-incrimination, since it forced him to choose between taking the stand in an attempt to mitigate the crime or declining to testify in the hope of gaining acquittal. This argument ignores the fact that mitigating evidence could have been shown through other witnesses, without waiving the petitioner's Fifth Amendment rights.

 Petitioner's final argument against Colorado's system of jury sentencing is that it is a denial of equal protection of the laws because it is used only in capital cases. It can not however be concluded that this legislative classification is arbitrary, unreasonable, or that it discriminates against capital offenders. Capital offenses are in a distinct class and the submission of the question to the jury is, as has been noted, a mitigating tendency. As we see it, the limitation of jury sentencing in this manner and for this purpose is not

discriminatory. See United States ex rel. Dukes v. Sain, 297 F.2d 799 (7th Cir. 1962), and In Re Ernst's Petition, 294 F.2d 556 (3rd Cir. 1961).

### The Alleged Unconstitutionality Based on Exclusion of Prospective Jurors Because of Scruples Against Capital Punishment

 Petitioner claims that his constitutional rights were violated as a result of the trial court's allowing challenges for cause as to any juror who had conscientious scruples against capital punishment. Petitioner argues this from the statements in Smith v. State of Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L. Ed. 84 (1940) and Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L. Ed. 680 (1942), that a jury must be "a body truly representative of the community." However, this general language does not support the extreme contention of petitioner. It does not follow from the fact that a jury must be a fair cross-section of the community that a defendant has a right to have persons as jurors who are opposed at the outset to existing law. In Turberville v. United States, 112 U.S.App.D.C. 400, 303 F.2d 411, 419 (1962), cert. den. sub nom., Williams v. United States, 370 U.S. 946, 82 S.Ct. 1596, 8 L.Ed.2d 813, the Circuit Court stated the proposition as follows:

> "What [the accused] is really asserting is the right to have on a jury some who may be prejudiced in his favor—i. e., some who are opposed to one possible penalty with which he is faced. We think he has no such constitutional right. His right is to absolute impartiality."

See also, United States v. Puff, 211 F.2d 171 (2nd Cir. 1954), cert. den., 347 U.S. 963, 74 S.Ct. 713, 98 L.Ed. 1106.

It is palpably illogical to demand jurors who are committed to a refusal to uphold or enforce existing law.

2. The states have a degree of leeway in dividing responsibility between judge and jury as long as fundamental fairness is retained. Spencer v. State of Texas, 385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967).

### The Contention that it was Constitutional Error for the Trial Court to Refuse to Hold a Two-Part Trial on the Issues of Sanity and Guilt

The trial judge refused to grant petitioner's demand for a two-part trial on the issues of sanity and guilt. Petitioner argues that this was a denial of his right against self-incrimination and his right to a fair and impartial trial.

 A plea of insanity at the time of the commission of the crime is a defense which traditionally has been tried with all other defenses. The fact that this defense may be collaterally inconsistent with other defenses claimed by the accused does not compel the trial court to hold a separate trial on each of the issues. In Spencer v. State of Texas, 385 U.S. 554, 567–568, 87 S.Ct. 648, 655–656, 17 L.Ed.2d 606 (1967), the Supreme Court declared:

"To say that the two-stage jury trial in the English-Connecticut style is probably the fairest, as some commentators and courts have suggested, and with which we might well agree were the matter before us in a legislative or rule-making context, is a far cry from a constitutional determination that this method of handling the problem is compelled by the Fourteenth Amendment. Two-part jury trials are rare in our jurisprudence; they have never been compelled by this Court as a matter of constitutional law, or even as a matter of federal procedure."

Therefore, it was within the sound discretion of the trial judge to determine whether the issues should have been in this case determined separately or together. Due process does not dictate either alternative. See, e. g., United States ex rel. Leon v. Banmiller, 179 F.Supp. 390 (E.D.Pa.1959), and Leick v. People (1955), 131 Colo. 353, 281 P.2d 806.

 Nor does it appear that the jury was incompetent to determine the questions of guilt, sanity and punishment at the same time. Petitioner places reliance on Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), where the Supreme Court held that the Constitution required a threshold hearing before a judge on the question of the voluntariness of confessions. But the Supreme Court has attributed this procedure to the "particularly stiff constitutional rules" that apply to confessions, and has cautioned against interpreting Jackson too broadly:

"It would be extravagant in the extreme to take Jackson as evincing a general distrust on the part of this Court of the ability of juries to sort out discrete issues given to them under proper instructions by the judge in a criminal case, or as standing for the proposition that limiting instructions can never purge the erroneous introduction of evidence or limit evidence to its rightful purpose." Spencer v. State of Texas, 385 U.S. at 565, 87 S.Ct. at 654.

The state has a valid governmental interest in trying criminal cases without unnecessary duplication, and some possible collateral prejudice should not require the state to hold a three-part trial on the issues of sanity, guilt and punishment, as the petitioner would like to have it in this case. If, of course, the prejudice should amount to fundamental unfairness, we would be justified in taking such a step. The issues were not so complex or confusing as to give rise to an inference of unfairness.

### Whether the Accelerated Timetable for the Disposition and Review of Petitioner's 35(b) Motion Violated Due Process and Equal Protection

On April 20, 1967, the petitioner filed his motion in state court seeking post-conviction relief under Rule 35(b) of the Colorado Rules of Criminal Procedure. The Colorado Supreme Court in granting a stay fixed a day certain for execution. It is claimed that this was a timetable approach which coerced an unfavorable decision from the trial Judge. The trial court's denial of petitioner's motion was upheld by the Colorado Supreme Court on August 22, 1967. Petitioner argues that

these expedited procedural dates required hasty and inadequate preparation of complex constitutional questions involved in the case, and thereby violated petitioner's rights under due process and his right to counsel.[3] The able and conscientious courts which were involved did not fail by reason of this to give full attention to the substantial merits.

■ Petitioner argues that the setting of a definite execution date amounted to an implied direction to the trial court to deny petitioner his request for relief, and that this "suggestion of predetermination" was a violation of due process. The Colorado Supreme Court's action does not lend itself to this interpretation, and no prejudice is apparent.

### The Question of Pre-Trial and Trial Publicity as a Deprivation

■ Petitioner's final claims are that pre-trial and trial publicity deprived him of a fair and impartial trial. A full hearing was held on this question in Denver District Court as a part of the 35(b) proceedings, and petitioner's contentions were rejected in an extensive written opinion. The District Court ruling was affirmed by the Colorado Supreme Court in Bell v. People, Colo., 431 P.2d 30, 32. Thus, the state court determination of this matter is presumptively correct under 28 U.S.C.A. § 2254(d) (Supp. February 1967). We have also held an evidentiary hearing on the publicity question, and now accept the state court findings as fully supported by the evidence.

The newsreels and newspaper articles produced at our hearing revealed nothing sensational, shocking or unrestrained in the pattern of Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). The detailed publicity occurred more than eight months before the jury was empaneled, and no significant recapitulation of the crime was published close to the trial date. The petitioner

relies on Rideau v. State of Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), where the Supreme Court held that the televising of a defendant in the act of confessing to a crime to be inherently prejudicial so as to require a change of venue. In the present case, a witness testified that there were silent television movies of the defendant viewing the scene of the crime, and there were still photos in the newspapers of the same event. However, we agree with the state court that "there is no comparison between the Rideau case and the case at bar." In Rideau the objectionable publicity consisted of a twenty minute television interview during which the defendant gave a detailed confession to the murder he was charged with. In every real sense, the television interview was "a 'trial' of Rideau in a jail, presided over by a sheriff, where there was no lawyer to advise Rideau of his right to stand mute." 373 U.S. at 727, 83 S.Ct. at 1419. In the present case, the petitioner could not even produce the film strip for viewing, and the evidence presented left the impression that it was ambiguous at best and not comparable with the damning "interview" in Rideau. We therefore hold that petitioner has not shown inherent prejudice in this case.

Similarly, it does not appear that petitioner can show that his efforts to empanel a fair and impartial jury were significantly hampered by pre-trial publicity. Only ten per cent of the prospective jurors voiced prejudice against the defendant, compared to ninety per cent in Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). See also, Beck v. Washington, 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962) (twenty-eight per cent not sufficient to show prejudice). Furthermore, no request was made by the defense for a continuance or a change of venue, and the defense did not exhaust its peremptory challenges. Under these circumstances,

---

3. The Attorney General argued that the constitutional questions of due process and right to counsel were not presented to the state court. This is incorrect. The state court was clearly confronted with this argument.

it can not be said that petitioner's trial was rendered fundamentally unfair by prejudice and feeling in the community.

Petitioner's allegation that his rights were violated as a result of publicity during trial is without merit. The publicity during this time cannot be considered significant, for the jury was sequestered from the time they took their seats as prospective jurors.

### Was Petitioner Denied Due Process by the Presence of Reporters and Photographers in Court?

Newspaper photographers were not excluded from the courtroom during Bell's trial, and representatives of the news media were allowed into the judge's chambers during hearings out of the presence of the jury. Photographers and reporters were not however allowed to move around the courtroom, and the photographers were not allowed to photograph the jury or to take pictures from a standing position. Noiseless non-flash equipment was used. A small number of photographs were taken, perhaps as few as a total of four in-court photos were made during the course of the week-long trial. The courtroom was not over-crowded, and all witnesses agreed that the proceedings were orderly and dignified. At no time did the defense object to the presence of cameramen, and at no time was the judge forced to admonish the news media for their actions. Television cameras were excluded during the course of the trial, but one such camera was allowed in court for the return of the jury and the reading of their verdict by the trial judge.

The petitioner asserts that the allowance of photography at the trial violated the due process standards of Estes v. State of Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), where the televising of criminal trials was held to be an inherent denial of due process. We assume that the holding of *Estes* applies retroactively to the Bell trial. However, *Estes* did not hold still photography inherently prejudicial, and certainly did not do so retroactively. The

Court's reasons for holding television inherently prejudicial do not apply to still photography:

1. The mere announcement that a trial is to be televised makes it a *cause celebre;* this is not so with still photography.
2. Unobtrusive and limited photography does not cause the uneasiness that television causes, since every movement and expression is not recorded.
3. Photographs do not alone cause the trial to be publicized to the extent that the jury would be subject to detailed scrutiny by the public.
4. New trials are not jeopardized as they are with televised trials, where the original trial can be seen and heard by large numbers of potential jurors.
5. The quality of witness testimony is not substantially affected by limited photography, while television has a tendency to "work profound changes in the behavior of the people it focuses on."
6. The invocation of the rule against witnesses is not affected by photography, as it is by television.

We do not believe that the mere presence of photographers at a criminal trial is a per se invasion of the due process guarantee. This is not to say that in certain circumstances abuses could not amount to a denial of due process. Indeed, if the evidence in this case had shown that the courtroom was filled with bulky equipment; that it was over-crowded with members of the news media; that a great number of photographers had taken numerous photographs; or that newsmen had been allowed to roam about the courtroom during the trial, then the particular facts would have justified a holding that the petitioner's trial was fundamentally unfair. However, this is not the evidence in the present case. Estes v. Texas did not hold that the presence of photographers constituted inherent prejudice.

The presence of a television camera in the courtroom when the verdict was rendered in this case does not seem to be a violation of due process. For all practical purposes, the trial was over. Consultation and deliberation had finished, and the essential dignity and order of the courtroom was not disturbed.

We have also considered the overall impact of the numerous points which have been raised, and are of the opinion that petitioner has not demonstrated a violation of his constitutional rights considering the totality of the circumstances in the record.

Accordingly, it is ordered that the Order to Show Cause be discharged and that the case be dismissed.