**UNITED STATES of America ex rel. Harry S. BERBERIAN**

v.

**S. Kenneth CLIFF, Warden.**

**Misc. No. 4256.**

United States District Court
E. D. Pennsylvania.

May 27, 1969.

Bernard L. Segal, Needleman, Needleman, Segal & Tabb, Philadelphia, Pa., for plaintiff.

Dist. Atty., Robert Newcomer, Asst. Dist. Atty. H. J. Rutherford, Lancaster County, for defendant.

## OPINION AND ORDER

TROUTMAN, District Judge.

This is a petition for a writ of habeas corpus in which relator seeks to have his judgment of conviction and sentence set aside because his Fourteenth Amendment right to due process was allegedly violated during the course of his trial in the following particulars:

1. The prosecution called a witness to the stand and elicited a Fifth Amendment claim of privilege against self-incrimination in the presence of the jury, the prosecution knowing in advance that the witness would refuse to testify and making no attempt to request a ruling on the claim out of the presence of the jury;

2. The prosecution used testimony which was compelled from a witness who had properly claimed the Fifth Amendment privilege against self-incrimination;

3. In the trial court's instructions to the jury, the trial judge failed to ade-

quately instruct the jury concerning evidence which was no longer properly before them and he also revived and emphasized a portion of that very same evidence.

The Commonwealth was ordered to show cause why a writ of habeas corpus should not be granted. Both the Commonwealth and relator's counsel have agreed that the merits of relator's contentions may be disposed of without the necessity of conducting an evidentiary hearing in this Court. Both sides filed briefs in support of their respective positions and oral argument was heard, at which time there was offered and admitted into evidence a copy of the record of the proceedings in the trial court.

An examination of the trial court record indicates that relator was indicted in the Court of Quarter Sessions of Lancaster County on Bill No. 65, March Term 1966, for conspiring to commit an abortion on one Melody McFarland; on Bill No. 64, March Term 1966, for conspiring to commit an abortion on one Elaine Ressler; and on Bill No. 63, March Term 1966, for being an accessory before the fact to an abortion performed on Elaine Ressler.

In support of the charges against relator, the prosecution introduced evidence indicating that relator is a practicing osteopathic physician in Lancaster, Pennsylvania. The principal prosecution witnesses were Melody McFarland and Elaine Ressler. They both testified that independent of one another and while pregnant they visited relator's office and asked him to abort them. He refused to do so, but offered to refer them to Helen Harris, a female abortionist living in Philadelphia. He advised them that the cost of the abortion would be two hundred dollars to him for his advice and for making the necessary arrangements and a like amount to Helen Harris for performing the abortion. They further testified that independent of one another and on instructions from relator they proceeded to Philadelphia, contacted Helen Harris by telephone when they arrived, and introduced themselves as "ton-

sils". Pursuant to that telephone conversation, they took a cab to the 200 block of East Upsal Street and walked to the home of Helen Harris at 369 East Upsal Street. Elaine Ressler testified that she paid two hundred dollars to relator for his advice and the same amount to Helen Harris for services rendered. Melody McFarland testified that she also paid relator two hundred dollars for his advice, but she paid nothing to Helen Harris because the police arrived before Helen Harris had any opportunity to take any steps to induce the abortion.

Arlene Scheetz, a sister of Elaine Ressler, testified that she accompanied her sister on the first visit to relator's office. She further testified that she was present when relator offered to make arrangements to have her sister aborted by a female abortionist in Philadelphia for four hundred dollars, two hundred to relator and the same amount to the abortionist.

Helen Harris testified that she first met relator when she took her child to him to have the child's tonsils removed. She advised him at that time that if he were ever in need of the services of an abortionist to call her. She further testified that relator did contact her and did make the necessary arrangements to have her perform an abortion on Elaine Ressler and that she did in fact do so. As to Melody McFarland, however, she testified that relator made no contact and made no arrangements to have her aborted.

Policewoman Martin of the Philadelphia Police Department testified that on information she followed Melody McFarland from Coatesville, Pennsylvania, to North Philadelphia by train and, together with Detective Corr of the Philadelphia Police Department, from North Philadelphia to the 200 block of East Upsal Street in Philadelphia by cab and from there to 369 East Upsal Street on foot. Detective Corr obtained a search warrant and they proceeded into the house. She further testified that once in the house she observed Melody McFarland and who later proved to be Elaine Ressler and Helen Harris. She also observed surgical instruments and certain devices commonly used for the purpose of performing abortions. Detective Corr also testified and itemized in detail the instruments and devices found in the house. The remainder of his testimony corroborated that of Policewoman Martin.

The Commonwealth having thus concluded its case, the defense demurred to the evidence on all indictments. The demurrer was sustained as to Bill No. 65 and was overruled as to the remaining Bills. Relator then took the stand in his own defense and denied the Commonwealth's testimony in all of its essential particulars. In concluding its case the defense produced many character witnesses on relator's behalf.

The jury returned a verdict of guilty on the charge of conspiring to commit an abortion on Elaine Ressler and on the charge of being an accessory before the fact to the same abortion. The constitutional questions now being pressed in this Court were raised in the State courts on direct appeal and relief was denied.

### 1. FIFTH AMENDMENT PLEA

The first argument advanced by relator is that the prosecution called Melody McFarland as a witness at a time when the District Attorney and the Court knew that she would claim her privilege against self-incrimination. After answering as to her name and address she invoked her privilege against self-incrimination and refused to answer any further questions. The District Attorney attempted to question the witness as to whether she had the right to invoke the privilege. On objection by defense counsel, the Court excused the jury and in their absence resolved the question of whether she was entitled to assert her privilege against self-incrimination. Relator contends that requiring a witness to invoke the privilege against self-incrimination in the presence of the jury created an aura of suspicion and connivance in their minds which was prejudicial to him. He further contends that this prej-

udice rises to the level of a deprivation of due process where the prosecution and the Court have advance notice that the witness intends to plead the Fifth Amendment.

In United States ex rel. Fournier v. Pinto, 408 F.2d 539, at page 541 (3rd Cir. 1969), the Court of Appeals for this Circuit stated:

"Many courts that have considered episodes of this kind in varying circumstances have found that the refusal of a prosecution witness to answer all, or all but the most innocuous, questions tends to prejudice the defendant. United States v. Tucker, 3rd Cir. 1959, 267 F.2d 212; Fletcher v. United States, 1964, 118 U.S.App.D.C. 137, 332 F.2d 724; United States v. Amadio, 7th Cir. 1954, 215 F.2d 605. 'When a witness claims his privilege, a natural, indeed an almost inevitable inference arises as to what would have been his answer if he had not refused. If the prosecution knows when it puts the question that he will claim the privilege, it is charged with notice of the probable effect of his refusal on the jury's mind.' United States v. Maloney, 2d Cir. 1959, 262 F.2d 535, 537.

"At the same time we are mindful of the observation of the Supreme Court that 'none of the several decisions dealing with this question suggests that reversible error is invariably committed whenever the prosecution causes a witness to claim his privilege not to answer in the presence of the jury. Rather, the lower courts have looked to the surrounding circumstances in each case, focusing primarily on two factors, each of which suggests a distinct ground of error. First, some courts have indicated that error may be based upon a concept of prosecutorial misconduct, when the Government makes conscious and flagrant attempt to build its case out of inferences arising from the use of the testimonial privilege. * * * A second theory seems to rest upon the conclusion that, in the circumstances of a given case, inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and this unfairly prejudiced the defendant.' Namet v. United States, 1963, 373 U.S. 179, 186–187, 83 S.Ct. 1151, 10 L.Ed.2d 278. Cf. Douglas v. Alabama, 1965, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed. 934."

A due process violation therefore is not automatically made out whenever the prosecution has advance notice that a potential witness intends to invoke the privilege and calls the witness to the stand which necessitates the invocation of the privilege in the presence of the jury. Rather, the circumstances of a given case must be examined to determine whether there is either prosecutorial misconduct by the District Attorney or unfair prejudice to the defendant.

In the case at bar, after having reviewed the trial court record, we are satisfied that the District Attorney did not engage in prosecutorial misconduct as that term is used in the decided cases. Admittedly, the prosecution with advance notice did call Melody McFarland to the witness stand and did compel her to invoke her Fifth Amendment claim in the jury's presence. But for the action of the District Attorney to constitute prosecutorial misconduct and thereby rise to the level of a due process violation a significant factor is whether an attempt was made by the prosecution to build its case out of inferences arising from the use of the testimonial privilege. No such attempt was made in this instance.

Nor do we believe that relator was unfairly prejudiced by Melody McFarland's having to invoke her privilege in the presence of the jury. The prejudice allegedly resulting to relator is the aura or odium of suspicion and connivance created in the minds of the jurors by the claim of constitutional privilege. Once the claim of privilege is asserted, an inevitable inference of suspicion and connivance arises in the minds of the jurors as a natural consequence of the witness'

refusal to answer. But the aura of suspicion or connivance must be viewed in the context of the strength or weaknesses in the prosecution's case to determine the degree of prejudice. We are satisfied, after reviewing the trial court record with care, that the prosecution established a very strong case against relator and any prejudice resulting to relator as a consequence of this incident is far from sufficient to make out a due process violation.

Moreover, any prejudice allegedly created in the minds of the jurors when a witness in their presence refuses to testify is dispelled, or at least substantially diminished, where, as in this case, the claim of privilege is overruled and the witness is directed to testify. This may not be true in all cases. But certainly where the testimony of the witness fully implicates the defendant in the crime for which he is charged, as did Melody McFarland's testimony, any aura or odium of suspicion generated by the initial refusal of the witness to testify is thereby substantially reduced.[1]

We do not mean to suggest that we condone the actions of the prosecutor in eliciting a Fifth Amendment plea in the presence of the jury. Where the prosecution has advance notice that a witness intends to invoke the privilege against self-incrimination a preliminary ruling out of the jury's presence should be requested. It was improper for the prosecution to have done otherwise in this case. But in our view the circumstances of this case are such that this impropriety standing alone does not rise to the level of a due process violation.

## 2. OVERRULING THE FIFTH AMENDMENT PLEA

The next argument advanced by relator is that after Melody McFarland invoked her Fifth Amendment claim of privilege the jury was excused and counsel argued whether she was entitled to claim the privilege. Her attorney argued that her testimony would implicate her in a number of crimes, primarily the charge of fornication. The trial court overruled her claim of privilege and purported to grant her immunity from prosecution on a charge of fornication. Relator contends that the trial court was in error in concluding that she was not entitled to claim the privilege against a possible charge of fornication and had no power to grant her immunity. Relator further contends that the erroneous overruling of the Fifth Amendment claim of privilege of this witness resulted in a trial which was fundamentally unfair to him and, therefore, a denial of due process.

It is clear under Pennsylvania law that an unmarried woman who has or attempts to have an abortion performed upon her is subject to possible prosecution on a charge of fornication. In Commonwealth v. Carrera, 424 Pa. 551 at page 554, 227 A.2d 627 at page 629 (1967), the Pennsylvania Supreme Court stated:

"Assuming arguendo, as the Commonwealth contends, that the victim cannot be prosecuted for her part in the abortion, there is nothing in the law to prevent her prosecution for a crime unrelated to the abortion itself, such as fornication. Further unless

---

1. Relator's counsel contends that although it may have been possible to cure the prejudicial impact of this witness's initial refusal to testify on the minds of the jurors by a cautionary instruction that no inference and no evidentiary significance may be drawn from or attached to the refusal of a witness to testify, no such instruction was given in this case. Even where the witness steadfastly refuses to testify, some courts have thought it pref-

erable, in the absence of a defense request for such a charge, to avoid reminding the jurors of the conduct of the witness by a cautionary instruction. Namet v. United States, 373 U.S. 179, 190, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963). However, since in our view the prejudicial impact of this incident was minimal there was absolutely no reason for such an instruction in this case, especially in the absence of a defense request for one

unusual circumstances exist as, e. g., rape, common sense dictates that an unmarried female who admits an abortion has been performed upon her acknowledges and admits she has committed fornication.  *  *  * "

The testimony sought to be elicited from Melody McFarland clearly would have established that she attempted to have an abortion performed upon herself and, therefore, would have subjected her to possible prosecution for fornication. Thus, she had every right to invoke her Fifth Amendment privilege against self-incrimination.

The Commonwealth suggests that the decision by the Pennsylvania Supreme Court in *Carrera* was prospective only, and therefore since *Carrera* was decided a few months after relator was tried and convicted it has no application to the case at bar. There is no suggestion that fornication was not a crime in Pennsylvania prior to *Carrera* and there is no contention that the Fifth Amendment was not then protected under the Fourteenth Amendment against abridgement by the states. Nor is there anything in the decision which would indicate that the Court intended to so limit its holding and we, therefore, find no merit in this argument.

■ Relator further contends that once it is established that Melody McFarland had a right to assert her Fifth Amendment privilege, the trial court was in error in purporting to overrule the assertion of privilege by a grant of immunity. The Commonwealth apparently concedes that there is no constitutional or statutory authority in Pennsylvania for the grant of such immunity; in the absence of which, District Attorneys in this Commonwealth have no right to grant it. Commonwealth v. Carrera, *supra*. Nor do we believe that members of the judiciary have the right to grant

immunity in the absence of statutory authority. To conclude otherwise would be to permit the judiciary to circumvent the intentions of the Legislature. Consequently, in our opinion the trial court's order directing this witness to testify was error and violated the constitutional rights of the witness.[2]

■ The issue we are faced with is now brought into sharper focus. Where a prosecution witness properly asserts a Fifth Amendment claim of privilege and the trial court erroneously overrules the claim of privilege by purporting to grant immunity, what constitutional right does the defendant have to object to any testimony thereby elicited from the witness. In Bowman v. United States of America, 350 F.2d 913 at pages 915 and 916 (9th Cir. 1965) the Court stated:

" *  *  * It has long been settled that the privilege against self-incrimination is personal to the witness. (Hale v. Henkel, 1906, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652; McAlister v. Henkel, 1906, 201 U.S. 90, 26 S.Ct. 385, 50 L.Ed. 671; United States v. Murdock, supra [284 U.S. 141, 52 S.Ct. 63, 76 L.Ed. 210]; United States v. White, 1944, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542; Rogers v. United States, 1951, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344; Communist Party of United States v. Subversive Activities Control Board, 1961, 367 U.S. 1, 81 S.Ct. 1357, 6 L.Ed.2d 625.) It is equally well settled that the witness can waive the privilege. Thus if Davie (witness) and Reves (witness) had each failed to assert the privilege, this would be nothing about which Bowman (defendant) would be entitled to complain.

"It makes no difference, we think, that the two witnesses did attempt to assert the privilege and that the court erroneously overruled their claim of

2. There is no question but that the witness has the right to object to any criminal prosecution based upon the use of unconstitutionally compelled testimony. It requires no citation of authority for the proposition that where testimony has

been improperly compelled from a witness over the witness's Fifth-Amendment claim of privilege there has been no intentional relinquishment or voluntary waiver of a constitutional right.

privilege. Where the witness is not the party, the party may not claim the privilege nor take advantage of an error of the court in overruling it. On this point the authorities are practically unanimous. (4 Jones on Evidence, 5th Ed., 1958, § 864, p. 1625; McCormick on Evidence, 1954, § 73, p. 153, § 133, p. 281; 8 Wigmore on Evidence, McNaughton Rev., 1961, § 2196, pp. 111–12, § 2270, at pp. 414–16; 3 Wharton's Criminal Evidence, 12 Ed., 1955, § 729, pp. 36–37; Morgan v. Halberstadt, 2 Cir., 1894, 60 F. 592; Taylor v. United States, 2 Cir., 1907, 152 F. 1; Hudson v. United States, 5 Cir., 1952, 197 F.2d 845; Poole v. United States, 9 Cir., 1964, 329 F.2d 720; compare Hyster Co. v. United States, 9 Cir., 1964, 338 F.2d 183, 187; Goldstein v. United States, 1942, 316 U.S. 114, 62 S.Ct. 1000, 86 L.Ed. 1312.)" [3]

Applying these well-established legal principles to the facts of this case, it is readily apparent that relator has no standing to object to the evidence elicited from Melody McFarland simply because it was obtained in violation of her constitutional rights. Moreover, since the Court's sustaining of the demurrer by the defense on Bill No. 65 removed from the jury's consideration the testimony elicited from Melody McFarland, the argument advanced by relator is even less compelling.

The most recent pronouncement by the Supreme Court on the right of a defendant to object to the use of evidence unconstitutionally obtained from another was made in Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176, opinion filed March 10, 1969. In that case the defendant sought to object to the introduction of evidence allegedly seized in violation of the Fourth Amendment rights of another. The Court stated at page 174, 89 S.Ct. at page 966:

"We adhere to these cases and to the general rule that Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted. Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). Compare Tileston v. Ullman, 318 U.S. 44, 46, 63 S.Ct. 493, 87 L.Ed. 603 (1943). None of the special circumstances which prompted NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), and Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953), are present here. There is no necessity to exclude evidence against one defendant in order to protect the rights of another. No rights of the victim of an illegal search are at stake when the evidence is offered against some other party. The victim can and very probably will object for himself when, as and if it becomes important for him to do so.

"What petitioners appear to assert is an independent constitutional right of their own to exclude relevant and probative evidence because it was seized from another in violation of the Fourth Amendment. But we think there is a substantial difference for constitutional purposes between preventing the incrimination of a defendant through the very evidence illegally seized from him and suppressing evidence on the motion of a party who cannot claim this predicate for exclusion."

Even the dissent of Mr. Justice Fortas in Alderman, at 200, 89 S.Ct. at 981, while contending that under certain circumstances a defendant should have the constitutional right to object to the use of evidence obtained in violation of the Fourth Amendment rights of another, conceded that as to evidence obtained in violation of the Fifth Amendment privilege against self-incrimination " * * * [o]nly the person whose right has been violated can claim the protection of that privilege. * * * "

---

3. See also Harrison v. United States, 128 U.S.App.D.C. 245, 387 F.2d 203, 214 (1967); Long v. United States, 124 U.S.App.D.C. 14, 360 F.2d 829, 834 (1966).

Relator contends that unless a defendant in a criminal case has standing to object, there is no way to deter a prosecutor from running "roughshod" over the rights of a witness in an effort to obtain a conviction of a particular defendant. There is no case of which we are aware, nor has relator cited us such a case, which holds that anything which deters the abuse of the claim of privilege is thereby mandated by the Fifth Amendment. In *Alderman,* supra, where a similar argument was advanced concerning the Fourth Amendment the Supreme Court stated at 174, 89 S.Ct. at 967:

" \* \* \* The deterrent values of preventing the incrimination of those whose rights the police have violated have been considered sufficient to justify the suppression of probative evidence even though the case against the defendant is weakened or destroyed. We adhere to that judgment. But we are not convinced that the additional benefits of extending the exclusionary rule to other defendants would justify further encroachment upon the public interest in prosecuting those accused of crime and having them acquitted or convicted on the basis of all the evidence which exposes the truth."

Moreover, this is not a case where the prosecutor and the Court maliciously abused the rights of this witness in an effort to obtain a conviction of relator. They believed, albeit erroneously, that the witness did not have the right to invoke the Fifth Amendment claim of privilege or that the Court had the power to grant immunity and it was based upon this belief that the Court directed the witness to testify.[4]

We do not mean to suggest that relator may not have been adversely affected by the testimony of this witness. Aside from the fact that the Court's sustaining of the demurrer removed Melody McFarland's testimony from the case, since relator's course of conduct on two separate occasions as described by both Melody McFarland and Elaine Ressler was essentially the same, the evidence relating to the charges concerning Elaine Ressler may have been more convincing from the jury's standpoint when contrasted with testimony elicited from Melody McFarland. But the fact that the Court was in error in directing her to testify would appear to only raise the question of whether relator is in a position to preclude the use of testimony unconstitutionally obtained from another and under the decided cases he apparently is not.

### 3. ERROR IN THE COURT'S INSTRUCTIONS

In its instructions to the jury the trial court reviewed the testimony of the witnesses called by the prosecution and the defense. While reviewing the testimony of Policewoman Martin, who followed Melody McFarland from Coatesville to the home of Helen Harris in Philadelphia, the Court added its own observation at pages 149 and 150 of the record and declared:

" \* \* \* You will note the uniformity in approaching the home of Helen Harris. Elaine Ressler later testified that she followed this same route that Melody followed getting off in the 200 block then walking to the home of Helen Harris. Was this by chance that they both did this or was this by design, by instruction? \* \* "

While reviewing the testimony of Helen Harris the Court stated at page 151 of the record:

" \* \* \* [Helen Harris] said that she had given her telephone number to the doctor so as to arrange a time to have her child's tonsils removed. Remember, that the girls, at least Elaine Ressler, when she called on the telephone, said that this is tonsils,

---

4. In People v. Portelli, 15 N.Y.2d 235, 257 N.Y.S.2d 931, 205 N.E.2d 857 (1965), where a similar argument was made, it was held that even if a witness had been tortured the defendant would still not have standing to preclude him from testifying.

according to instructions which she said she received from Doctor Berberian. * * * "

While reviewing inconsistencies in the testimony of the prosecution witnesses and relator the Court stated at page 157 of the record:

"* * * There are at least two witnesses here who said, that the price of the abortion was $400.00; $200.00 to the Defendant and $200.00 to Helen Harris. * * * "

In discussing the effect of the sustaining of the demurrer to the charge relating to Melody McFarland, the Court stated at pages 154 and 155 of the record:

"I am skipping over the testimony of Melody McFarland, since the charge of conspiracy as to her has been dismissed by the Court. This is also a charge of conspiracy and at the close of the testimony, the Defendant demurred to that testimony, which says in effect, accepting as true everything the Commonwealth has said, they haven't said enough to make out a case. The Court has agreed with them. There is no definite proof here there was any combination or agreement between the Defendant and Helen Harris concerning Melody McFarland, therefore that case is dismissed and you will not consider it."

Based upon the portions of the charge above quoted, relator contends that the trial court not only failed to adequately instruct the jury to disregard the evidence dealing with Melody McFarland in determining guilt or innocence on the charges dealing with Elaine Ressler, but proceeded to compare and contrast the very same evidence.

We wish to make it clear at the outset that in the exercise of his discretion, and in reliance upon Commonwealth v. Patrick, 416 Pa. 437, 206 A.2d 295

(1965), the trial judge consolidated for trial the charge against relator which relates to Melody McFarland with the charges relating to Elaine Ressler. No objection was made to the consolidation and no request was made for a severance. We do not mean to suggest that relator is necessarily foreclosed from raising such a question after trial where he has failed to raise it before trial. We point this out merely to indicate that relator did not at the time of trial, nor is he now, objecting to the consolidation and that had these charges been severed the allegations now before this Court would never have arisen.

The justification for the joinder of separate and distinct offenses involving the same defendant appears to be the economy of a single trial. One argument against joinder is that there is always a danger when several crimes are tried together that the jury may use the evidence cumulatively and find guilt when, if the crimes were considered separately, it would not so find. The danger is increased or multiplied when the crimes charged and the evidence introduced to substantiate those charges are similar in nature. It is because of this danger that where separate and distinct but similar crimes involving the same defendant are to be tried together —and we are not to be understood as intimating that the joinder in this case was in any way ill-advised—the Court must recognize that it is assuming a difficult task the performance of which calls for the utmost precision in speech and action far beyond that required in the ordinary trial.

■ We must keep in mind, however, that the sufficiency of these instructions is normally a matter of State law and procedure not involving Federal constitutional issues.[5] Kearney v. Peyton, 360 F.2d 589 (4th Cir. 1966) It is not

---

5. There are some courts which appear to suggest at times without qualification that errors in the instructions are not reviewable on habeas corpus. Maxwell v. Hudspeth, 175 F.2d 318 (10th Cir. 1949); Wallace v. Hunter, 149 F.2d 59 (10th Cir. 1945); United States ex rel. Borday v. Claudy, 108 F.Supp. 778 (M.D.Pa.1952).

our function to review this charge as would a State court on direct appeal.[6] Nor is it our function merely to determine whether there is error in the charge. It is our sole function to decide whether the errors, if any, in the charge are of sufficient magnitude to be fundamentally unfair and thereby rise to the level of a due process violation.[7]

In the case at bar, relator was charged with conspiring to perform an abortion upon Melody McFarland. The demurrer by the defense to this charge was sustained, no other charge before the Court related to her, and no reference was made to her by the defense in its case. Yet the Court proceeded to compare and contrast the manner of approach to the home of Helen Harris, the use of the word "tonsils", and the amount paid for the abortion by Elaine Ressler with that of Melody McFarland. As to the amount of the payment, the Commonwealth contends that the "two witnesses" who testified that the price of the abortion was two hundred dollars to relator and the same amount to Helen Harris referred to Elaine Ressler and her sister, Arlene Scheetz. It is conceded that Arlene Scheetz did so testify. It is also conceded that Melody McFarland testified at page 115 of the record that she gave no money to Helen Harris. However, since Melody McFarland also testified as to the price of the abortion, aside from what was actually paid, the reference to "two witnesses" was at best ambiguous.

The substance of some of what was compared does not appear to have been damaging to relator, especially where the Court, through the testimony of Police-woman Martin, contrasted the manner in which Melody McFarland approached the home of Helen Harris with the manner in which Elaine Ressler approached the same home. It is true that the Court not only contrasted the manner of approach, but it proceeded to attach some special evidentiary significance to it by posing the question whether it "[w]as * * * by chance that they both did this or was this by design, by instruction?" However, if the Court was suggesting that it may have been at relator's direction that the manner of approach was the same, it was completely in error. Both Melody McFarland and Elaine Ressler testified that it was as a result of their telephone conversations with Helen Harris once they arrived in Philadelphia that they approached the home as they did. There is no evidence in the record that it was done at relator's direction, nor is there any evidence in the record from which such an inference could be drawn. Indeed, at page 87 of the record, although it was subsequently stricken on objection by the defense on the ground of hearsay, Elaine Ressler testified in no uncertain terms that Helen Harris instructed her to proceed as she did. To the extent the Court was in error in so misleading the jury, the resulting damage to relator was substantially diminished when the Court elsewhere in the charge, at page 149 of the record, instructed the jury that their recollection of the testimony controlled.

Relator contends, however, that aside from the substance of what was compared the mere fact that comparisons were made and parallels drawn deprived him of due process, especially when viewed in the context of that portion

6. Martinez v. Patterson, 371 F.2d 815 (10th Cir. 1966); United States ex rel. Petersen v. LaVallee, 279 F.2d 396 (2nd Cir. 1960); Kenion v. Gill, 81 U.S.App. D.C. 96, 155 F.2d 176 (1946).

7. United States ex rel. Berkery v. Rundle, 390 F.2d 599 (3rd Cir. 1968); Johnson v. Bennett, 386 F.2d 677 (8th Cir. 1967); United States ex rel. Marelia v. Burke, 197 F.2d 856 (3rd Cir. 1952);

Clark v. Peyton, 280 F.Supp. 205 (W.D. Va.1968); Bell v. Patterson, 279 F.Supp. 760 (D.C.Colo.1968); United States ex rel. Chase v. Rundle, 266 F.Supp. 487 (M.D.Pa.1967); McKinney v. Boles, 254 F.Supp. 433 (N.D.W.Va.1966); United States ex rel. O'Halloran v. Myers, 248 F.Supp. 280 (E.D.Pa.1965); United States ex rel. Bonomolo v. Wallack, 238 F.Supp. 14 (S.D.N.Y.1965).

of the Court's charge dealing with the effect of the sustaining of the demurrer to the indictment charging relator with conspiring to perform an abortion on Melody McFarland. The Court charged that since there was "no definite proof" of such a conspiracy "that case is dismissed and you will not consider it". By so instructing the jury the Court properly charged that there was insufficient evidence in regard to the charges involving Melody McFarland and that the indictment relating to her was not before them for adjudication. But, relator contends, this falls far short of instructing the jury that they are not to consider the testimony in support of the McFarland indictment in arriving at its verdict on the Ressler indictments. Admittedly, the Court did not specifically so instruct the jury. However, in instructing the jury not to consider the McFarland case it is certainly arguable that the McFarland indictment and the evidence in support of it constitute the McFarland "case" and were thereby removed from the jury's consideration.

The thrust of relator's position is that the Court erred in failing to adequately instruct the jury to disregard evidence in support of the McFarland indictment in determining relator's guilt or innocence on the Ressler indictments. Considering the evidence adduced against relator on the charges dealing with Elaine Ressler alone, there is no question but that the Commonwealth had a substantial case which turned essentially on credibility. In support of the Commonwealth's charges the victim of the abortion testified, her testimony was in part corroborated by that of a relative, and the individual who allegedly conspired with relator to perform the abortion also testified. The Court properly and fairly instructed the jury at pages 148 and 149 of the record that the credibility of the witnesses was critical in reaching its verdict.

The inadequacy of the charge was subject to exception and to appeal. No request for further instruction was made on the points now raised, and the attitude of the Court, as reflected in the entire record, was such as to indicate that if a reasonable request had been made, further instructions would have been given. No specific exception to the charge was taken on the points now raised, and only a general exception was taken to protect the record. We consider this especially relevant because the written transcript does not recreate fully the atmosphere of the courtroom and defense counsel was in the best position to gauge the impact which these errors had on the jury.

Admittedly, the charge to the jury contained inconsistencies and omitted many refinements in definition and instruction which could have been made. Mere errors in the charge, however, do not constitute sufficient basis for the grant of a writ of habeas corpus. The errors must be such that the accused is denied a fair trial in the constitutional sense. It is in that light that we have examined the errors in the charge and it is our considered opinion that they are not of sufficient magnitude to rise to the level of a due process violation.

We do not mean to suggest that we approve of the charge given in this case. Nor are we to be understood as approving the conduct of the prosecutor in eliciting the Fifth Amendment plea in the jury's presence or the action of the Court in overruling the plea. We merely hold that after a careful examination of the entire record, we are of the opinion that these errors, either individually or collectively [8], are not such as to constitute a denial of due process of law.

We will, therefore, deny the writ.

8. It is possible to make out a due process violation based upon the cumulative effect of a series of errors, rather than the effect of each error when considered alone. See United States ex rel. Fournier v. Pinto, *supra*; United States ex rel. Drew v. Myers, 327 F.2d 174 (3rd Cir. 1964).