**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Frank ALTOBELLA and James Moxley, Defendants-Appellants.**

**Nos. 18254, 18255.**

United States Court of Appeals, Seventh Circuit.

April 8, 1971.

Rehearing Denied May 26, 1971.

---

Thomas D. Decker, Ronald P. Alwin, Federal Defender Program, Chicago, Ill., for defendants-appellants.

Craig M. Bradley, Atty., Dept. of Justice, Criminal Div., Washington, D. C.,

William J. Bauer, U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, Chief Circuit Judge, KNOCH, Senior Circuit Judge, and STEVENS, Circuit Judge.

STEVENS, Circuit Judge.

The squalid facts of this case give rise to a serious question of federal jurisdiction. The record discloses a plain violation of the Illinois statute prohibiting extortion.[1] The issue for us to decide is whether defendants are also guilty of violating either the federal conspiracy statute, 18 U.S.C. § 371, or the federal statute enacted in 1961 "to prohibit travel or transportation in commerce in aid of racketeering enterprises," 75 Stat. 498, 18 U.S.C. § 1952. Although the "Travel Act" can be read to cover this case, we have concluded that this prosecution is beyond the limits of the criminal jurisdiction which Congress intended to confer on the federal courts.

I

The jury found both appellants guilty on both counts. To clarify the federal question, we shall first summarize the evidence disclosing a violation of Illinois law.

The participants in the extortion were appellants Altobella and Moxley and a young entertainer named Joan Patterson.[2] Patterson's testimony described the plan. She agreed to help Altobella and Moxley "to make a fast buck." She was to pick up a businessman, preferably one who was married and had a family, in one of the hotel bars in the loop area. "After I met him I was supposed to lead him to believe that he was a Don Juan, and then take him to an apartment and * * * get him into a compromising position so that pictures could be taken."[3]

1. Ill.Rev.Stat., Ch. 38, § 16-1 (1969).

2. Patterson was separately indicted; after the conviction of Altobella and Moxley, the charges against her were dismissed.

3. In the ensuing several days Altobella showed her an apartment he had rented

(he paid the weekly rent of $30 in advance on September 27, October 5, and October 12). He explained how the pictures would be taken, and pointed out that a telephone had been installed to enable her to call before she brought the badger to the apartment. In general, Al-

In early October Patterson made the acquaintance of a Philadelphia businessman in the Essex Motel bar. Before they parted he told her that he would be returning to Chicago in about ten days, and requested her to call him at the Sherman House. Promptly thereafter Patterson reported to Altobella that she had "found just the type of guy we were looking for." They then agreed upon the procedure for taking pictures.

On Thursday, October 19, Patterson reached her victim at the Sherman House and made a date for that evening. During dinner she excused herself, telephoned the defendants, and then led the badger into the trap. In due course the flashbulbs went off, Altobella accompanied by Moxley came into the bedroom with a gun, and Patterson departed with the camera and film. Except for receiving $50 from Altobella the next day, Patterson had no further contact with the extortion. She destroyed the camera and film on Saturday, after learning that Altobella had been arrested.

The victim testified that after Patterson departed, Altobella made a demand for $5,000 for the return of the negatives. He responded that "Under no circumstances would I ever be able to get that kind of money * * * then they reduced the amount to * * * $2500, which I said was just as ridiculous * * * and after about an hour and a half or so, I told them that the best thing that I could do under any circumstances was to give them maybe $500 or $600. They wanted me to go down to the hotel and get it from friends. I told them that I couldn't do that, but that I would give them $100 now, plus the money that I had on the table, which was about $50 or $60, and they took $50 of it and left me with the $15. I told them I would go down to the hotel and write a check and give them $100."

Moxley told him that he would be contacted at home and would have to bring the rest of the money to Chicago; Altobella and Moxley stated that they would tell him when and where the meeting would take place. They did not state whether the contact would be by phone or letter.[4]

Altobella then drove the victim to the Sherman House and waited outside for 10 or 15 minutes while he went to his hotel room, obtained his checkbook and wrote a check, which he cashed at the desk. He then delivered $100 to Altobella who was waiting about a block from the hotel.

■ Appellants concede that the foregoing facts established a violation of the Illinois Criminal Code. They dispute the sufficiency of the following additional facts as a basis for federal jurisdiction.

Appellants knew their victim was from Philadelphia. They knew he intended to obtain the $100 by cashing a personal check. The check was drawn on a Philadelphia bank. After being cleared through two Chicago banks, it was forwarded to Philadelphia by mail on October 24. Altobella accepted the $100 proceeds and thereafter distributed $50 to Patterson.

## II.

Both counts of the indictment focus on the use of the mails to carry on an unlawful activity, to wit, extortion in violation of Illinois law. Both counts charge that the unlawful activity continued after the use of the mails.[5]

---

tobella reported that the project was going "pretty good except we need some money for photographic equipment."

4. The witness testified that he assumed the contact would be by telephone, but that assumption was stricken.

5. Count One of the indictment charged a violation of 18 U.S.C. § 371. It charged that appellants engaged in a conspiracy with Patterson beginning on or about October 1, 1967, and continuing until October 20, 1967, to use "facilities in interstate commerce, to wit, the United States Mail," to carry on "an unlawful activity, to wit, extortion, in violation of the laws of the State of Illinois," and thereafter to "perform acts of promotion, management, establishment and carrying on of the said unlawful activity, in violation of

It is the government's theory that the mails were used on October 20, 1967, when appellants caused their victim to cash a $100 check which was then irrevocably started on its way to Philadelphia. The defendants contend that the mails were not used until October 24, 1967, when the Federal Reserve Bank in Chicago forwarded the item to Philadelphia. Both parties agree that the charges in the indictment required proof that appellants' unlawful activity was carried on after the "use" of the mails within the meaning of 18 U.S.C. § 1952. The requirement of unlawful activity "thereafter" is satisfied, according to the government, by Altobella's acceptance of $100 and his delivery of part of those proceeds to Patterson.

Theoretically, the conspiracy charge and the substantive charge could raise different issues. On the peculiar facts of this case, however, both counts present us with the question whether a violation of the Travel Act has been established. There is no evidence in the record of any actual or intended use of the mails by appellants with the single exception of their acceptance of their victim's offer to cash a check for $100 at his hotel.[6] For the purpose of decision, we find it unnecessary to decide whether the use of the mails occurred on October 20 or October 24, 1967, within the meaning of 18 U.S.C. § 1952. We assume with the government that causing the check to be cashed on October 20 established the time when appellants' use of the mails occurred. We do not agree, however, that that one act, plus what happened "thereafter," was sufficient to invoke the federal statute.

### III.

The relevant statutory language reads as follows:

"§ 1952. Interstate and foreign travel or transportation in aid of racketeering enterprises.

"(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

"(1) distribute the proceeds of any unlawful activity; or

"(2) commit any crime of violence to further any unlawful activity; or

"(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both."

In general, the purpose of the Travel Act was to attack criminal activities extending beyond the borders of one state by providing federal assistance in situations in which local law enforcement was ineffective. United States v. Nardello, 393 U.S. 286, 290–292, 89 S.Ct. 534, 21 L.Ed.2d 487.[7] Two principal ingredients

---

Title 18, United States Code, Section 1952."

Count Two charged that on October 20, 1967, appellants and Patterson did use and cause to be used the United States Mail to carry on an unlawful activity, "and thereafter, on or about October 20, 1967," they did perform acts facilitating the carrying on of said unlawful activity in violation of 18 U.S.C. § 1952.

6. Except for the evidence tending to prove the substantive violation, the record contains no evidence tending to prove the conspiracy charged in the indictment. The government argues that the indict-

ment may be read to contemplate future mailings in aid of the criminal enterprise. But if that reading is warranted, it is unsupported by proof.

7. "Testimony produced at the hearings clearly demonstrated the interstate network of criminals engaged in such unlawful activities. It further demonstrated the need for the assistance of the Federal Government in view of the fact that law enforcement authorities are limited and hindered by the interstate nature of these activities." H.R.Rep.No.966, 87th Cong., 1st Sess., 1961 p. 3.

of the offense were specified: the kind of unlawful activity characteristically pursued by organized crime; and the use of interstate facilities in aid of the criminal enterprise.[8]

That Congress did not intend to exercise its full constitutional powers in the area of local law enforcement is demonstrated by the wording of the Act and specifically by the use of the word "thereafter." As the Senate report on S.1653 states:

"* * * to come within the provisions of the bill some activity in furtherance of a racketeering enterprise,

subsequent to the performance of the travel, must take place * * * accordingly the gravamen of the offense will be travel and a further overt act to aid the enterprise." S.Rep.No.644, 87th Cong., 1st Sess.1961, p. 2.[9]

To warrant federal intervention we believe the statute requires a more significant use of a facility of interstate commerce in aid of the defendants' unlawful activity than is reflected on this record. Cf., United States v. Hawthorne, 356 F.2d 740 (4th Cir. 1966), cert. denied 384 U.S. 908,[10] 86 S.Ct. 1344, 16 L.Ed.2d 360.

---

In a letter dated April 6, 1961 (reprinted in H.R.Rep.No.966, *supra*, at p. 4), addressed to the Speaker of the House of Representatives, Attorney General Kennedy stated, in part:

"Over the years an ever-increasing portion of our national resources has been diverted into illicit channels. Because many rackets are conducted by highly organized syndicates whose influence extends over State and National borders, the Federal Government should come to the aid of local law enforcement authorities in an effort to stem such activity.

"The bill which I submit to the Congress would impose criminal sanctions upon the person whose work takes him across State or National boundaries in aid of certain 'unlawful activities.'

＊ ＊ ＊ ＊ ＊

"The effect of this legislation would be to impede the clandestine flow of profits from criminal ventures and to bring about a serious disruption in the far-flung organization and management of co-ordinated criminal enterprises. It would thus be of material assistance to the States in combatting pernicious undertakings which cross State lines."

8. "The Attorney General testified before the committee on May 17, 1961, in support of the bill. In this testimony he cited numerous instances of the use of the facilities of interstate commerce by racketeers and hoodlums to promote the illegal enterprise, to distribute the proceeds among the syndicate members of illegal gambling, liquor, narcotics, and prostitution business and the use of the facilities for the commission of crimes of violence in furtherance of the unlawful activities." H.R.Rep.No.966, *supra* at p. 2. See S.Rep.No.644, 87th Cong., 1st Sess.

1961; Pollner, "Attorney General Robert F. Kennedy's Legislative Program to Curb Organized Crime and Racketeering," 28 Brooklyn L.Rev. 37 (1961); Miller, "The 'Travel Act,' a New Statutory Approach to Organized Crime in the United States," 1 Duquesne L.Rev. 181 (1963).

9. The conference report accompanying the final version of S.1653, which is now 18 U.S.C. § 1952, makes it clear that adoption of the House proposal, which combined the two sections of the Senate draft and eliminated the words "after such travel" as superfluous, did not change the bill substantively. H.R. Conference Report No. 1161, 87th Cong., 1st Sess. 1961, p. 4. The government has not argued that the scope of the Act is broader when use of the mails is charged. The Senate report explains the Keating amendment to S.1653 extending the coverage of the statute to use of the mails. There is no suggestion in the report that the scope of the Act is intended to be broader when the mails or other facilities of interstate, rather than travel, are involved. See S.Rep. No.644, *supra*, at p. 2.

10. The following excerpts from the Attorney General's testimony at the Senate hearings on June 6, 1961, are quoted in the Senate report accompanying S.1653:

"Let me say from the outset that we do not seek or intend to impede the travel of anyone except persons engaged in illegal businesses as spelled out in the bill.

＊ ＊ ＊ ＊ ＊

"The target clearly is organized crime. The travel that would be banned is travel 'in furtherance of a business enterprise' which involves gambling, liquor, narcotics, and prostitution offenses or extortion or bribery. Obviously, we are not trying to curtail the sporadic, casual

Thus, a gambling operation conducted on an interstate carrier, United States v. Brennan, 394 F.2d 151 (2nd Cir. 1968), cert denied 393 U.S. 839, 89 S.Ct. 117, 21 L.Ed.2d 110, or by regularly traveling across a state line to obtain essential supplies, United States v. Puntillo, 440 F.2d 540 (7th Cir. 1971); the employment of out-of-state specialists in aid of the criminal enterprise, United States v. Roselli, et al., 432 F.2d 879 (9th Cir. 1970), cert. denied, 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828; the use of interstate "credit cards" and mailing lists to attract out-of-state patrons, United States v. Rizzo, 418 F.2d 71 (7th Cir. 1969); and the use of a Western Union ticker tape recording information received from out of state as a regular and continuous element of the illegal enterprise, United States v. Miller, 379 F.2d 483 (7th Cir. 1967); all provide examples in which federal assistance to local law enforcement is entirely appropriate and clearly contemplated by the history and language of the Travel Act.

But there is nothing about the appellants' enterprise, as disclosed by the evidence, which suggests any reason why state police powers need to be supplemented by the federal government. The use of the mails by the bank through which appellants' victim's check was cleared, a few days after it had been cashed at the Sherman House, was purely incidental to appellants' sordid scheme. Their purpose would have been achieved equally well if the victim had borrowed $100 from associates at the hotel or written a check on a local bank. Moreover, the unlawful activity which followed the cashing of the check was merely the payment of $50 to Patterson. Unquestionably, the distribution of proceeds of criminal activity may satisfy the "thereafter" requirement of the statute in a proper case. But when both the use of the interstate facility and the subsequent act are as minimal and incidental as in this case, we do not believe a federal crime has been committed.[11]

---

involvement in these offenses, but rather a continuous course of conduct sufficient for it to be termed a business enterprise.

"When the tightly written provisions of this bill are set against the tremendous area of interstate commerce which involves traveling by individuals, I believe it is clear that we have carefully delineated an area of law enforcement which will disrupt the organized criminal syndicates without interfering with general travel.

"Our investigations also have made it quite clear that only the Federal Government can shut off the funds which permit the top men of organized crime to live far from the scene and, therefore, remain immune from the local officials. So we believe that the Federal Government has a definite responsibility to move against these people and limit their use of interstate commerce." S. Rep.No.644, *supra*, at p. 3.

In summarizing the bill on the floor of the Senate, Senator Eastland stated, in part:

"The Committee has received testimony that the complex operations of today's organized criminal syndicate recognize no state boundaries. S.1653 is intended to disrupt the interstate operation of these criminal organizations by making it impossible for organized gambling and other illegal activities to operate on an interstate scale beyond the reach of local law enforcement agencies.

   \*     \*     \*     \*     \*

"The Committee has tightened the bill to require that the individual doing the traveling for an illegal purpose must, after his travel, perform or attempt to perform one of the acts forbidden by the bill." 107 Cong.Rec., Part 10, p. 13943.

11. We have no occasion to consider the constitutional limits of federal power over local crimes because it is clear that Congress did not intend to exercise its full power over criminal activities that merely affect interstate commerce. It was primarily concerned with the interstate activity itself. Compare Federal Trade Commission v. Bunte Brothers, Inc., 312 U.S. 349, 351, 61 S.Ct. 580, 85 L.Ed. 881, with United States v. Frankfort Distilleries, Inc., 324 U.S. 293, 298, 65 S.Ct. 661, 89 L.Ed. 951. See also, Marshall v. United States, 355 F.2d 999, 1004 (9th Cir. 1966).

Unquestionably appellants' unsuccessful attempt "to make a fast buck" is punishable as a crime.[12] We merely hold that the State of Illinois is the appropriate sovereign to prosecute their offense.[13] We do not believe Congress intended to authorize federal intervention in local law enforcement in a marginal case such as this. We are guided by the Supreme Court's admonition "that in ascertaining the scope of congressional legislation a due regard for a proper adjustment of the local and national interests in our federal scheme must always be in the background, * * *" Federal Trade Commission v. Bunte Brothers, Inc., 312 U.S. 349, 351, 61 S.Ct. 580, 582, 85 L.Ed. 881.

The judgment is reversed.

12. The government also suggests that the application of the statute is warranted by the fact that appellants' victim was from out of state. That theory, however, is not set forth in the indictment and there was no evidence of a plan to lure out-of-state victims to Chicago, or even that the conspirators intended to select an out-of-town victim. Moreover, the application

of the statute on a comparable theory has just been squarely rejected by the Supreme Court. Rewis v. United States, 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (decided April 5, 1971).

13. It is clear that Congress did not intend to preempt state prosecutions in this area. H.R.Rep.No.966, supra, at p. 3.