UNITED STATES of America,
Plaintiff-Appellee,

v.

Talmadge G. RAUHOFF,
Defendant-Appellant.

No. 75–1207.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 16, 1975.

Decided Nov. 11, 1975.

David P. Schippers, Chicago, Ill., for defendant-appellant.

Samuel K. Skinner, U. S. Atty., Donald C. Shine, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before STEVENS and SPRECHER, Circuit Judges, and GRANT, Senior District Judge.*

GRANT, Senior District Judge.

Appellant Talmadge G. Rauhoff brings this appeal from his conviction by a jury on all counts of a twenty-one count indictment. Rauhoff was indicted for his involvement from 1968 to 1970 in a scheme to bribe Illinois Secretary of State Paul Powell in order to procure and retain contracts for the production of Illinois license plates.

The scheme was apparently originated by James S. White and J. Patrick Stoltz

---

* Senior District Judge Robert A. Grant of the United States District Court for the Northern District of Indiana is sitting by designation.

in 1968. At that time White was the Chief Purchasing Agent in the Secretary of State's office. His duties included supervision of the purchase of Illinois vehicle license plates, and he reported directly to Powell. Stoltz was the owner and executive officer of the Metal Stamping Corporation of Conway, Arkansas. Metal Stamping Corporation was a subcontractor of the King Seeley Thermos Corporation of Macomb, Illinois, which had been the exclusive recipient of the Illinois license plate contract since 1940. Stoltz wanted the contract for his corporation, Metal Stamping. When White informed Powell of Stoltz's desire, Powell said that it was all right with him as long as he, Powell, did not lose money in the changeover. Powell was reportedly receiving $20,000 per year from King Seeley.

White arranged for a November, 1968, meeting in Chicago with James P. Manning, a former King Seeley license plate expert who acted as an adviser to Powell on license plate matters from September 1968 to June 1969. Manning liked the idea. White suggested that Rauhoff be included in the scheme because he could acquire the large sums of money which would be necessary without arousing suspicion. That same afternoon, Rauhoff agreed to participate, and the three men began to formulate the plan.

White, Manning, Stoltz and Rauhoff met again in Chicago in December, 1968. In February, 1969, Stoltz traveled to Chicago for another meeting. The plan which emerged from these meetings, in short, was as follows:

Metal Stamping retained Manning as its Illinois representative, in which position he was to receive a "commission." In turn, Manning was to assign his commission to Strucolite, Inc., a dummy Illinois corporation whose shareholders were Manning, Rauhoff and White. Rauhoff held White's shares as nominee. The payoffs to Powell, as well as the profits for the others, were to come from Strucolite's funds. On Rauhoff's suggestion, the payoffs to Powell were set at $30,000 instead of the $25,000 upon which White

and Manning had earlier agreed. This figure later reached $50,000 when King Seeley "upped the ante" to $40,000. At Rauhoff's suggestion, John M. Leonard was selected as lawyer for the group.

When the bids were opened in White's office in February, 1969, Metal Stamping had underbid King Seeley, and Powell awarded the contract to Metal Stamping.

The method of payment need not be recounted in great detail here. It appears, however, that Rauhoff acted as a "money launderer," an essential link in the procedure by which Metal Stamping's checks to Strucolite became cash for Powell's shoeboxes. On one occasion in January, 1970, Rauhoff went to Manning's office with two checks totaling $15,000, both of which were drawn on Strucolite's account and made payable to Manning. Rauhoff sought to have Manning endorse the checks so that he, Rauhoff, could take cash to Springfield. Manning was reluctant to endorse the checks because of the tax consequences to him. Rauhoff told him to treat it as salary and that he would be given money to pay the taxes on it.

Some $80,000 was ultimately paid to Powell prior to his death in October, 1970. The only apparent source of Strucolite income was the assignment of Manning's "commissions", which amounted to approximately $487,000.

In 1974, Rauhoff, Leonard, Stoltz, Strucolite and Metal Stamping were indicted by a federal grand jury. White, Manning and Powell were named as unindicted co-conspirators. Nine counts of the indictment charged mail fraud in violation of 18 U.S.C. § 1341 (1970), (Counts Two through Ten); ten charged use of interstate facilities to promote bribery in violation of 18 U.S.C. § 1952 (1970), (Counts Eleven through Twenty); one charged conspiracy to commit interstate bribery and mail fraud in violation of 18 U.S.C. § 371 (1970), (Count One); and one charged aiding in the preparation and submission of a false corporate tax return in violation of Int.Rev.Code of 1954, § 7206(2), (Count Twenty-one).

Stoltz and Leonard pled guilty to certain counts of the indictment prior to trial and were fined and placed on probation. Strucolite pled guilty to the conspiracy count subsequent to Rauhoff's trial, and was fined. Metal Stamping was dismissed as a party defendant on the motion of the government. A jury found Rauhoff guilty on each count of the indictment. He was sentenced to three years imprisonment on each count, the sentences to run concurrently.

Rauhoff raises several issues for review by this court:

1. Whether there was sufficient involvement of interstate facilities to support federal jurisdiction under § 1952.

2. Whether the mailings charged as violations of § 1341 were in furtherance of a scheme or artifice to defraud.

3. Whether there was sufficient evidence to support the findings of guilty on Counts One and Twenty-one.

4. Whether White's testimony should have been suppressed on the grounds of misuse of the grand jury process and misuse of the immunity statutes.

5. Whether Rauhoff was punished for exercising his right to a trial by jury.

## I—FEDERAL JURISDICTION UNDER THE TRAVEL ACT

18 U.S.C. § 1952(a) (1970) provides:

"§ 1952. Interstate and foreign travel or transportation in aid of racketeering enterprises.

"(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

"(1) distribute the proceeds of any unlawful activity; or

"(2) commit any crime of violence to further any unlawful activity; or

"(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity;

"and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3) shall be fined not more than $10,000 or imprisoned for not more than five years, or both."

Ten counts of the indictment charged violation of the Travel Act. One of these counts is distinctly different from the other nine: Count Twenty involves the use of commercial airline service to transport Stoltz from Arkansas to Chicago for his February 1969 meeting with Manning to discuss the latter's "commission". The remaining Travel Act counts (Counts Eleven through Nineteen) charge use of the Federal Reserve System for the purpose of bribery; federal jurisdiction over each of these counts is based upon the travel of the commission checks, payable to Strucolite and drawn on the funds of Metal Stamping, through interstate facilities from the depositary bank in Chicago to the drawee bank in Arkansas.

Rauhoff argues that the use of interstate facilities was at best minimal, incidental and so peripheral as to amount to mere happenstance, and as such cannot form the basis for federal jurisdiction under the Travel Act. We cannot agree. Contrary to Rauhoff's assertions, this court's holdings in *United States v. Isaacs*, 493 F.2d 1124 (7th Cir.), cert. denied, 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974), and *United States v. Altobella*, 442 F.2d 310 (7th Cir. 1971), do not compel reversal of his convictions on Counts Eleven through Nineteen.

In *Altobella*, we recognized that Congress did not intend to exercise its full constitutional powers in the area of local law enforcement when it enacted § 1952, but rather intended to attack criminal activities extending beyond the borders of a single state in order to aid, rather than to replace, local law enforcement efforts. In *Altobella*, the defendants' activity amounted to no more than extortion, a state offense; the purported basis for federal jurisdiction was the defendants' acceptance from their victim of a

check written on an out-of-state bank, and their cashing of the check. We noted that the use of the interstate facilities "was purely incidental to appellant's sordid scheme. Their purpose would have been achieved equally well if the victim had borrowed $100 from associates at the hotel or written a check on a local bank. Moreover, the unlawful activity which followed the cashing of the check was merely the payment of $50 to Patterson." Accordingly, we held that while the defendants had certainly committed a crime, it was not a federal crime. We did not hold, however, that use of the Federal Reserve System could never form the basis for federal jurisdiction under § 1952.

Isaacs dealt with a scheme to bribe, among others, the governor of Illinois. Three of the nineteen counts in Isaacs charged violation of the Travel Act, and federal jurisdiction was again founded upon use of the Federal Reserve System. Three of the checks used to distribute the proceeds of the bribery scheme had been drawn on a bank in Alton, Illinois; when the recipients of the bribes deposited the checks in Illinois banks, the checks cleared through the Federal Reserve Bank in St. Louis, Missouri. This court rejected the government's efforts to distinguish Altobella, and held that "the use of interstate facilities here was so minimal incidental, and fortuitous, and so peripheral to the activities of Isaacs, Kerner and the other participants in this bribery scheme, that it was error to submit Counts II, III and IV to the jury." 493 F.2d at 1146.

However, Isaacs, like Altobella, did not hold that use of the Federal Reserve System could never form the basis for federal prosecution under § 1952. Isaacs plainly indicates that black-letter rules are inappropriate under the Travel Act: The test, Isaacs states, "is the nature and degree of interstate activity in furtherance of the state crime." 493 F.2d at 1148. The Isaacs court underscored this test by contrasting the situation before it with that found in United States v. Lee, 448 F.2d 604 (7th Cir.), cert. de-

nied, 404 U.S. 858, 92 S.Ct. 107, 30 L.Ed.2d 100 (1971). While Isaacs and Kerner were responsible for only three checks, Lee involved continual interstate travel by employees of the illegal venture. If the Isaacs court had intended to hold the nature of the illegal activity alone determinative, it would have been unnecessary to discuss the degree of the activity in Lee.

■ This case, like Lee, involves extensive interstate activity. While Altobella involved but one check, and Isaacs involved "only three", 493 F.2d at 1148, nine separate checks formed the bases of Rauhoff's Travel Act convictions. We do not mean to imply that these numbers are determinative in seeking federal jurisdiction under the Travel Act; § 1952 contains no provision for a "jurisdictional amount". The degree of interstate activity, is however, a factor to be considered under Isaacs. See also United States v. Puntillo, 440 F.2d 540 (7th Cir. 1971).

We believe, too, that the nature of the interstate activity shown in this case justifies jurisdiction under the Travel Act. This is not a situation in which a purely local crime acquired an interstate flavor merely because its victim chose to write a check rather than borrow money from his associates, as in Altobella. This is not a situation in which a check, written by an Illinois resident, payable to an Illinois resident, and drawn on and deposited in Illinois banks, entered Missouri solely because of the fortuitous organization of the Federal Reserve System, as in Isaacs. Nor is this a situation in which relatively minor state offenses would be transformed into federal felonies on the basis of the geographic origin of customers. Rewis v. United States, 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971).

This is a situation in which an Arkansas businessman and an Illinois public official agreed to engage in illegal activity, bribery, for mutual profit, by laundering apparently legal "commission" checks from Metal Stamping in Arkansas

through a corporation in Illinois. The success of the scheme presupposed the successful laundering of Strucolite's funds, and the first step in the successful laundering of the funds was deposit of the Arkansas checks in an Illinois bank. The checks then returned to Arkansas via the collection process of the Federal Reserve System, an interstate facility. Thereafter, carefully laundered cash was passed from Rauhoff to White to Powell. In sum, there was significant use of interstate facilities, and "thereafter", to use the statutory term, significant unlawful activity took place.

■ Use of the Federal Reserve System cannot be said to have been incidental or peripheral to this activity; to the contrary, it was essential to its success. Jurisdiction over Counts Eleven through Nineteen was proper under the Travel Act, and the convictions thereon are affirmed.

■ Rauhoff also maintains that Stoltz's trip via commercial airline from Arkansas to Chicago, upon which Count Twenty is founded, was peripheral and incidental to the bribery. This argument is without merit. Stoltz's meeting with Manning occurred only five days prior to the opening of the bids. Stoltz testified that the primary purpose of the meeting was to establish Manning's "commission" rate so that Stoltz could apply that rate to his selling price. He could not, he testified, determine Metal Stamping's bid until that "commission" rate was finalized. This trip was plainly critical to the success of the plan, and cannot be said to have been peripheral or incidental. Federal jurisdiction over Count Twenty was proper, and the conviction thereon is affirmed.

## II—THE MAIL FRAUD COUNTS

Counts Two through Ten of the indictment charged violations of the mail fraud statute, 18 U.S.C. § 1341 (1970). Each of these counts is based upon the mailing of a check from Metal Stamping in Arkansas to Strucolite in Illinois. The checks are the same as those which provide the jurisdictional bases of Counts Eleven through Nineteen. Rauhoff raises several arguments in attacking his conviction on the mail fraud counts. Each of these arguments is based upon the unassailable proposition that the mailings must be shown to have been made in furtherance of a scheme or artifice to defraud; the mailings must not have been merely incidental to such a scheme. *United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974); *Parr v. United States,* 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960); *Pereira v. United States,* 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954).

■ Rauhoff first seems to suggest that because all of the participants in the scheme were reaping profits, nobody was defrauded. This argument ignores the people of Illinois, who were defrauded of their right to have the business of the office of the Secretary of State conducted free from bribery, their right to loyal and faithful service of their state officials, and of the right to those secret profits obtained by Powell as Secretary of State. There was a scheme or artifice to defraud.

Rauhoff then argues that the purpose of the scheme was to obtain the license plate contract for Metal Stamping. The contract was irrevocably awarded to Metal Stamping in February, 1969, and thus at that time the scheme had reached fruition. All of the mailings charged in the indictment occurred subsequent to October 16, 1969, some eight months after the objective of the scheme had been obtained. Therefore, Rauhoff argues, the mailings cannot be said to have been made in furtherance of the scheme to obtain the contract.

In a related argument, Rauhoff suggests that there are two distinct agreements in this case. On the one hand is the agreement to bribe Powell and White. This agreement was purely local in character, Rauhoff suggests. It involved no mailings; all of the payments were delivered by hand. The amount of

the bribes were completely unrelated to the price to the State for the license plates under the contract, according to Rauhoff.[1] This was the scheme which defrauded the people of Illinois. On the other hand, Rauhoff maintains, is the separate "commission" agreement between Manning and White. The amount of these commissions were completely unrelated to the bribes, because they were based upon a percentage of the selling price of the plates to the State. All of the mailings charged in the indictment were made pursuant to this legal contract between Stoltz, as President of Metal Stamping, and Manning.

These arguments miscast the nature of the scheme here charged. They tacitly presume that Rauhoff had no purpose in his participation other than the personal satisfaction of having been part of a scheme whereby an Arkansas firm obtained the lucrative Illinois license plate franchise and the people of Illinois were defrauded. Not only does such a presumption blink reality, it finds no justification in either the indictment or the proof at trial. The plan called for the Metal Stamping funds to be used not only for bribes, but also for personal enrichment of the participants (including Rauhoff), for reimbursement to the participants on those occasions upon which it became necessary that they contribute to the payoffs from their own pockets, and for covering up the transactions by subsidizing personal income tax payments by the participants who paid taxes upon "salaries" which they never received.

 Mailings are in furtherance of a scheme if they are incidental to an essential part of the scheme. *Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 98 L.Ed. 435 (1954). Under this definition, mailings made after the scheme

has reached its fruition are not in furtherance of the scheme *United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), nor are mailings which conflict with the purposes of the scheme and have little effect upon the scheme. *United States v. Staszcuk,* 502 F.2d 875 (7th Cir. 1974). On the other hand, mailings made to promote the scheme, *United States v. Joyce,* 499 F.2d 9 (7th Cir.), *cert. denied,* 419 U.S. 1031, 95 S.Ct. 512, 42 L.Ed.2d 306 (1974), or which relate to the acceptance of the proceeds of the scheme, *United States v. Isaacs,* 493 F.2d 1124 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974), or which facilitate concealment of the scheme, *United States v. Sampson,* 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962), have been found to have been in furtherance of the scheme under this definition. Thus, it cannot be said, as Rauhoff contends, that mailings which occur subsequent to the fraudulent acts may never be in furtherance of the scheme. *See Bannister v. United States,* 379 F.2d 750 (5th Cir.), *cert. denied,* 390 U.S. 927, 88 S.Ct. 861, 19 L.Ed.2d 988 (1967); *see also Parr v. United States,* 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960).

 The mailings charged in Counts Two through Ten were made in furtherance of the scheme. They related to acceptance of the proceeds of the scheme, and facilitated concealment of the scheme. Just as it was essential that Rauhoff and Strucolite launder the funds before they were forwarded to White and Powell, it was essential that the funds first reach Rauhoff and Strucolite. The mailings were incidental to this essential part of the scheme.

Rauhoff's convictions on Counts Two through Ten of the indictment are affirmed.

---

1. This would appear to be a misstatement of fact. As noted above, Stoltz testified that he could not prepare the Metal Stamping bid for the license plate contract until the amount of the commission payments was finalized. It was further shown that the bribes were ultimately to be paid from the commission payments by Metal Stamping. Thus, the bribes

were "buried" in the commission charges which, in turn, were "buried" in the price of the license plates under the contract.

In light of our rejection of Rauhoff's "dual agreement" theory, however, this disagreement is not material.

## III—COUNTS ONE AND TWENTY–ONE

Count One of the indictment charged conspiracy in violation of 18 U.S.C. § 371 (1970). Rauhoff was alleged to have conspired with others to commit offenses in violation of 18 U.S.C. § 1952 (the Travel Act) and 18 U.S.C. § 1341 (the mail fraud statute). Rauhoff employs what can best be described as a domino theory in attacking his conviction on this count: The mailings, travel and use of the Federal Reserve System charged in the substantive counts do not amount to violations of federal law; therefore an agreement to so mail travel and use the Federal Reserve System cannot amount to a violation of federal law.

■ The premise of Rauhoff's domino argument is incorrect: The acts charged in the substantive counts do amount to federal crimes. Nothing more need be added regarding this argument. Rauhoff's conviction on Count One is affirmed.

Count Twenty-one charged that Rauhoff violated Int.Rev.Code of 1954, § 7206(2) by aiding and assisting in the preparation of Strucolite's false corporate tax return for the fiscal year ending September 30, 1970. Strucolite had claimed a business deduction of $25,000 for salary purportedly paid to Manning. Rauhoff claims that the evidence was insufficient to support his conviction on this count. He concedes that there was evidence that he had attended two meetings with Leonard, Manning and Manning's account, during the course of which the preparation of the tax return was generally discussed. Rauhoff maintains that this evidence is alone too fragile to support the conviction.

There was also testimony by Manning, however, that when Rauhoff went to Manning to get the latter to endorse checks for $15,000 as part of the "laundering" process, Manning balked on the basis of the tax consequences to him. Manning testified that Rauhoff told him that the $15,000 would be considered as salary to Manning from Strucolite, and that Manning would be given money to pay the taxes on the amount. Manning also testified that the $25,000 shown on Strucolite's corporate return consisted of the $15,000 in checks he had endorsed, $7,500 given to him by Strucolite to pay his personal income taxes on the $15,000, and $2,500 which he actually received.

■ There is thus sufficient evidence to support Rauhoff's conviction on Count Twenty-one, and the conviction on that count is affirmed.

## IV—SUPPRESSION OF WHITE'S TESTIMONY

At trial, Rauhoff moved to suppress the testimony of White on the ground that the testimony had been procured through misuse of the grand jury process and in violation of the spirit and language of the immunity statutes, 18 U.S.C. §§ 6002, 6003. The District Judge denied his motion. Rauhoff claims this was error.

White had been cooperating with government attorneys and investigators for more than a year and a half prior to his appearance before a grand jury. He had sworn to at least two statements, and Rauhoff produced several sets of longhand notes taken by representatives of the Internal Revenue Service during prior meetings. When he was taken before a federal grand jury in Springfield, Illinois, on May 17, 1973, White asserted his fifth amendment privilege against self-incrimination in response to questions put to him by a representative of the Department of Justice. Rauhoff maintains that White did so "solely for the purpose of procuring an immunity order, and on advice of his attorney". White was taken before a judge and granted use immunity on the basis of a petition and affidavit filed by the Government.

Rauhoff contends that in supporting White's efforts to obtain immunity after

a year and a half of full cooperation, the Government, with White, committed a fraud upon the grand jury and violated the immunity statutes.

 The rule is well settled in this circuit that a defendant has no standing to challenge a grant of immunity to a witness who testifies against him. *United States v. Braasch,* 505 F.2d 139, 146 (7th Cir. 1974), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1562, 43 L.Ed.2d 775 (1975); *Lopez v. Burke,* 413 F.2d 992 (7th Cir. 1969). *See also United States v. Lewis,* 456 F.2d 404 (3rd Cir. 1972); *United States ex rel. Berberian v. Cliff,* 300 F.Supp. 8 (E.D.Pa.1969). Rauhoff recognizes this general rule, but argues that the courts should afford a remedy when "the grant of immunity is in direct violation of law, and constitutes a fraud and misuse of the grand jury." Rauhoff cites us to no case in which such action was taken, but this case is not in any event such a case in which such intervention would be warranted by Rauhoff's argument. Every requirement of § 6003 was followed in the grant of immunity to White.

Rauhoff makes several policy arguments regarding the potential for abuse under § 6003. There is no indication that Congress was unaware of this potential when it enacted the statute.

 Thus, even under the broader standing requirement endorsed by Rauhoff, which we do not adopt here, Rauhoff would have no standing to attack the grant of immunity to White. There was no error in refusing to suppress White's testimony.

## V—THE SENTENCE

Rauhoff was the only individual conspirator to be sentenced to a prison term under this indictment. Stoltz pleaded guilty to Counts One through Twenty and at the recommendation of the Government, was fined $30,000, ordered to make restitution of the money paid to Powell, and placed on probation. Leonard pleaded guilty to Counts One and Twenty-one and was fined $15,000 and placed on probation for a period of three years. White and Manning were granted immunity. Powell, as counsel for Rauhoff so aptly stated at sentencing, "is facing his judgment elsewhere."

Rauhoff was also the only individual defendant to go to trial. He now contends that he received a harsher sentence than the other defendants solely because he exercised his constitutional right to trial by a jury.

At the time of sentencing, Rauhoff argued to the judge, as he now argues again, that his role in the conspiracy was a minor one. In response to a question by the judge, the attorney for the Government disagreed with that characterization of Rauhoff's role. Rauhoff also noted, as he notes again here, that his co-defendants had been fined and placed on probation. After hearing Rauhoff's argument, Judge Decker said,

"Well, except in the one instance of the defendant who appeared before me, I had no control over what happened to any other defendant in this case and I am simply making a decision insofar as this defendant is concerned on the basis of the evidence I heard in this courtroom; I make it not on the basis that he stood trial—he had the right to stand trial. There are legal problems in connection with this case, as there are in most cases, and you certainly are going to be at liberty to present those to some other court. But I am going to—I think that I do have a responsibility in a case involving a bribing of a public official to do something about it and in this case I am going to sentence the defendant to the custody of the Attorney General, or his authorized representative, for imprisonment for a period of three years."

 As a general rule, so long as a sentence is within the statutory maximum, the court will not exercise its su-

pervisory powers to inquire into the propriety of a sentence, even when that sentence creates a disparity with the sentences of co-defendants. *Hill v. United States,* 368 U.S. 424, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962); *United States v. Willard,* 445 F.2d 814 (7th Cir. 1971); *United States v. Melendez,* 355 F.2d 914 (7th Cir. 1966). One exception to this rule exists where a trial judge has attempted to punish a defendant for the exercise of sixth amendment right to a trial by jury. *United States v. Stockwell,* 472 F.2d 1186 (9th Cir.), *cert. denied,* 411 U.S. 948, 93 S.Ct. 1924, 36 L.Ed.2d 409 (1973); *Baker v. United States,* 412 F.2d 1069 (5th Cir. 1969), *cert. denied,* 396 U.S. 1018, 90 S.Ct. 583, 24 L.Ed.2d 509 (1970); *United States v. Wiley,* 278 F.2d 500 (7th Cir. 1960).

Rauhoff has not cited any case in which this exception to the general rule has been applied solely on the ground of a disparity of sentences, and in the face of an affirmative statement of the district judge that the defendant is not being sentenced for the exercise of his sixth amendment rights.

The sentence imposed upon Rauhoff is well within the statutory maximum available to a sentencing court when a defendant has been convicted of twenty-one counts of an indictment for use of interstate facilities in aid of bribery, mail fraud, conspiracy and assisting in the preparation of a false corporate tax return. Judge Decker specifically stated that Rauhoff was not sentenced for going to trial. Under these circumstances, this court will not review the sentence.

The sentence is affirmed.