**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Charles C. CLARK and Jay G. Denney,
Defendants-Appellants.**

**No. 79–2335.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 6, 1980.

Decided June 1, 1981.

---

John D. Bodine, Mishawake, Ind., for defendants-appellants.

Donald P. Moroz, Asst. U.S. Atty., South Bend, Ind., for plaintiff-appellee.

Before SWYGERT, Circuit Judge, WISDOM, Senior Circuit Judge,* and PELL, Circuit Judge.

SWYGERT, Circuit Judge.

Defendants-appellants were convicted of conspiracy to defraud by use of the United States mails in violation of 18 U.S.C. § 371 and mail fraud in violation of 18 U.S.C. § 1341. On appeal, defendants raise the following issues for review: (1) was the indictment excessively vague as to the illegality charged; (2) was evidence of prices charged improperly admitted prior to proof

---

* The Honorable John Minor Wisdom, United States Senior Circuit Judge for the Fifth Circuit, sitting by designation.

of a conspiracy; (3) was there proof of a single conspiracy including both the home repair business dealings and the stock transaction; (4) was the mailing of the dividend check made for the purposes of executing the fraudulent scheme; and (5) was it error to admit the dividend checks, restrict questioning about a complaint in a civil suit, admit testimony of an admission made by one co-defendant, and deny the defendants' motion for a judgment of acquittal. For the reasons stated herein, we affirm.

I

Viewed in the light most favorable to the Government, *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Aviles*, 623 F.2d 1192 (7th Cir. 1980), the facts in this case are as follows. Defendants-appellants Charles C. Clark and Jay G. Denney were engaged in the home repair business under the names Twin City Heating and Construction, Inc., Twin City Service Company, Twin City Heating and Home Improvement Company, and Twin City Heating and Air Conditioning Company. In June or July 1975, referring to themselves respectively as Chuck Wilson and Jay, Clark and Denney went to the home of Mary Snell, a seventy-six year old woman living alone in Logansport, Indiana and requested permission to inspect her furnace. They told Snell that her furnace was unsafe and should be replaced. Despite the fact that Snell had previously encountered no problems with her furnace which was purchased in 1971 or 1972, Snell agreed to have Clark and Denney install a new furnace, for which she was charged $4,360. Between July and September 1975, the defendants advised Snell of other defects they allegedly discovered in her home, and they performed the following work: installation of braces in the attic and basement at a cost of $1,500, installation of a flue-liner in the chimney for $2,591, and installation of a new roof for $5,798.

Steven Heinrich, a heating contractor and expert witness for the Government, testified that the cost of labor and material to install a furnace such as Snell's was $742.00 in 1978. Snell had paid $4,360 in 1975.[1] According to Heinrich, the workmanship was "very shoddy." Edwin Medland, a building contractor, also testified as an expert for the Government. He stated that the braces should have cost $576.00, including profit, overhead, materials, and labor. A fair price for the flue-liner, he testified, was $1,270 and for the roof, $3,063.[2] All of Medland's estimates were based on 1978 rates although Snell had paid for the work in 1975.

At the time of the installation of the new roof, the defendants represented that Snell would receive free labor on future repairs if she became a partner in their company. Snell testified that she was also promised $6,000–8,000 in quarterly dividends. Snell entered into an agreement with Clark and Denney whereby she agreed to purchase four hundred shares of stock for $34,000. She was told that defendants' company was doing very well. In partial payment for the stock, Snell gave the defendants a check for $26,760 on August 28, 1975. According to the stock agreement, the balance of $7,240 was to be paid by Snell out of dividends over an eighteen-month period. At Clark's request, however, in about January 1976 Snell paid most of the balance due by issuing a check for $6,277.

Snell's check for $26,760 was deposited on August 29, 1975 in the Twin City Heating and Air Conditioning account at the First National Bank of Marion, Indiana. On the same day, two checks for $13,000 each were drawn on that account. Both checks were made payable to J & M Construction Company, and endorsed "J. M. Construction" and "Bill Dunbar"; one check was also endorsed "Jay C. Clark" and the other "J. G.

---

1. Defendant Clark testified that Snell also received certain service guarantees along with the furnace.

2. Snell testified that she was told by Clark that there were termites in her old roof. According to Medland, no evidence of termites could be found anywhere in Snell's house. Medland testified that he had never heard of termites being present in a roof without first infesting the base of the house.

Denney." Clark testified that J & M Construction was a small company owned by Denney and himself which he conceded had done no work for Snell. The checks, he stated, were made payable to J & M Construction as a vehicle to avoid withholding taxes on money paid to Clark and Denney from the Twin City account. The checks were deposited in the respective personal banking accounts of each of the defendants.

Between September 1975 and August 1977, Snell received $2,380 in dividend checks. After that she received no dividends at all. Snell testified that she received the dividend checks through the United States mails. Dated checks and one envelope were admitted into evidence. Subsequent to the stock agreement, defendants installed some insulation in Snell's house. She was charged $3,100. They also repaired a waste pipe and vent for which Snell paid $2,962. Defendants' business ceased operations in April 1978 due to an inability to meet expenses.

Defendants were indicted on one count of conspiracy to defraud by use of the United States mails in violation of 18 U.S.C. § 341, and seven substantive counts of mail fraud in violation of 18 U.S.C. § 1341. The jury returned a verdict of guilty on the conspiracy count and on one of the substantive mail fraud counts; defendants were found not guilty on the other six substantive counts. This appeal followed.

## II

Defendants argue first that the trial judge erred in denying their motion to dismiss the indictment. Defendants contend that the indictment was excessively vague in that Count I did not apprise them of whether the illegalities charged related solely to the stock transaction or also included the home repair business dealings with Snell occurring, prior to the stock transaction. Paragraph 4 of Count I, it is argued, is ambiguous, especially read together with overt acts 1–5 of the same

count. The relevant paragraphs of Count I of the indictment are:

4. It was a part of the conspiracy that the defendants herein would and did falsely represent Twin City, Inc. and the service it would perform for Mary Snell.

5. It was a further part of the conspiracy that the defendants herein would and did fraudulently induce Mary Snell to buy shares of stock in Twin City, Inc.

7. It was a further part of the conspiracy that the defendants herein would and did mail dividend checks to Mary Snell for the purpose of concealing their scheme to defraud and to further obtain money from Mary Snell by means of false and fraudulent pretenses, representations and promises.

The first five overt acts of the thirteen[3] listed in Count I were:

1. In or about June or July, 1975, [defendants] spoke to Mary Snell in Logansport, Indiana,

2. In or about July, 1975, [defendants] obtained checks from Mary Snell.

3. In or about August, 1975, [defendants] obtained checks from Mary Snell.

4. In or about September, 1975 [defendants] obtained a check from Mary Snell.

5. In or about September, 1975, [defendants] each deposited or caused to be deposited money in their personal bank accounts.

In our view, the most logical reading of paragraph 4, given the circumstances of this case and the order in which the events are described in the indictment, is that the defendants are charged with falsely representing their business and the services it would perform prior to inducing Snell to buy stock. Any doubt as to that interpretation is resolved by the very portion of the indictment next challenged by defendants, namely, overt acts 1–3 which refer to business dealings in June and July and "checks" received in August. The proposal that Snell buy stock in defendants' company was

---

**3.** Paragraph 6 of the indictment and overt acts 13–16 were deleted by the trial judge and are not at issue here.

not made until the installation of the new roof in late August or early September. The installation of the furnace, the braces, and the flue-liner were all paid for by Snell in July before the stock transaction was ever broached. Overt act 1 refers to a conversation occurring in June or July. Overt act 2 specifies checks obtained by the defendants in July and can only refer to the payments for the furnace, braces, and flue-liner. We are certain that overt acts 1 and 2 clarified for the defendants, assuming clarification was necessary, that their prior business dealings with Snell were alleged to comprise a part of the conspiracy. Moreover, overt act 3 refers to "checks" obtained by the defendants from Snell in or about August 1975. Only two checks fitting that description were introduced into evidence, one dated August 27, 1975 and the other dated August 28. The first August check was an initial payment on the new roof and the second, a payment of $26,760 on the stock.

In light of the above, we hold that Count I of the indictment was sufficiently detailed and unambiguous to apprise defendants of the range of activities alleged to be unlawful. *United States v. Grizaffi*, 471 F.2d 69 (1972), *cert. denied*, 411 U.S. 964, 93 S.Ct. 2141, 36 L.Ed.2d 684 (1973). In a conspiracy charge, the illegality charge need not be alleged as precisely as would be necessary in a substantive count. *Id.* at 73. Here the conspiracy count made sufficiently clear that the defendants were charged with an overall scheme to defraud including both the repair work on Snell's home and the subsequent stock transaction which involved the use of the United States mails.

### III

Defendants next contend that the trial court erred in denying their motion in limine for an order preventing the introduction of evidence of defendants' home repair business dealings with Snell prior to the stock transaction until there was proof of a conspiracy to which those business dealings were relevant. Defendants argue that the

law in this circuit on the admissibility of co-conspirator statements, wherein a conspiracy must be proved by a preponderance of the evidence for the statements to be admissible,[4] should be extended to require the finding of a conspiracy in order to prohibit the introduction of the potentially prejudicial evidence of fraudulent business dealings here. Defendants would also have us require that the finding of a conspiracy be made prior to the admission of the evidence. We decline to adopt defendants' suggestions.

In *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978), we were interpreting Rule 801(d)(2)(E) of the Federal Rules of Evidence, which specifies that co-conspirator statements made during the course of the conspiracy are admissible at trial. The issue there was how that rule would be implemented. In this case we are faced with a simple question of the relevancy of otherwise admissible evidence. Even in the Rule 801(d)(2)(E) situation, however, the alleged co-conspirator statements may be admitted before a conspiracy is found, subject to the trial judge subsequently declaring a mistrial or giving a cautionary instruction if the conspiracy showing is not made. *United States v. Santiago*, 582 F.2d at 1131. The order of proof is a matter almost wholly within the discretion of the trial judge. In the instant case, the trial judge did ultimately find that a conspiracy existed, and we are persuaded that his finding was not erroneous.

Central to defendants' argument that the home repair evidence was not relevant to the conspiracy is the contention that the home repair business dealings occurring prior to the stock transaction were not sufficiently closely related to the mailing of a dividend check to be a part of a conspiracy to defraud by use of the United States mail. In their brief, defendants allege that it was error to allow evidence of the prices charged Snell for the repair work "prior to the establishment of the existence of a conspiracy to defraud and prior to the govern-

---

4. *See United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978).

ment's establishment of the use of the mails in furtherance of such conspiracy." Apart from the order of proof issue discussed above, we understand the defendants to be making two further legal arguments: first, that there was not a single conspiracy to defraud including both the prior business dealings and the stock transaction; and second, that the mailing was not made for the purpose of executing the scheme as required by the mail fraud statute. *See Pereira v. United States*, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954).

### A. Conspiracy

■ We hold that the Government has adequately charged and proved a single conspiracy to defraud in which the defendants schemed to obtain money from Snell through false and fraudulent representations. There was evidence that at least some of the home repairs which Snell was told were required for her safety were in fact unnecessary. Snell was charged exorbitant prices for the work performed, some of which was "shoddy." At the time that Snell was told she needed a new roof, defendants proposed that she buy stock in their company as a means of saving money on future home repairs. Snell agreed to purchase stock after being promised quarterly dividends of $6,000–8,000 and free labor on home repairs. In fact she received $2380 on her investment between 1975 and 1977 and nothing thereafter. She also continued to pay for home repairs.

■ In *United States v. Dalzotto*, 603 F.2d 642, 645 (7th Cir.), *cert. denied*, 444 U.S. 994, 100 S.Ct. 530, 62 L.Ed.2d 425 (1979), this court stated: "Most courts have been willing to find that evidence is sufficient to establish a single conspiracy where clear overlapping of membership and activities, all directed toward a common goal is present. [citation omitted]." Here we find that clear overlapping of membership and activities and a common goal. It is not disputed that the defendants were the persons involved in both the home repairs business dealings and the subsequent stock transaction. Those activities were also related. Snell was charged exorbitant prices

for the work "needed" in her home and then offered the opportunity to buy stock in defendant's company in order to save money on repairs in the future. Moreover, through the prior business dealings, defendants encouraged Snell's dependence and established her gullibility. Those qualities were then exploited in the subsequent stock transaction. The common goal toward which all of defendants' activities were directed was the obtaining of money from Snell on the basis of false and fraudulent representations. Even if the stock transaction aspect of the scheme was not planned when Snell was initially approached in June or July, it became an essential part of the scheme to defraud that developed. It is not necessary for the Government to show that the plan was complete in all its aspects from its inception. *United States v. Becker*, 569 F.2d 951 (5th Cir.), *cert. denied*, 439 U.S. 865, 99 S.Ct. 188, 58 L.Ed.2d 174 (1978).

■ The defendants argue that the mailing of a dividend check was not sufficiently related to the business dealings occurring prior to the stock transaction. That argument is answered in *Pereira v. United States*, 347 U.S. 1, 12, 74 S.Ct. 358, 364, 98 L.Ed. 435 (1954), in which the Supreme Court said: "It is not necessary that an agreement to use the mails exist from the inception of the scheme to defraud. If there was such an agreement at any time it is sufficient." Moreover, the mailing itself need not be essential to the scheme so long as it is incidental to an essential part of the scheme. *United States v. Lea*, 618 F.2d 426 (7th Cir.), *cert. denied*, —— U.S. ——, 101 S.Ct. 82, 66 L.Ed.2d 25 (1980). Here, the stock transaction to which the mailing was incidental was the means by which the largest sum of money was obtained from Snell.

### B. Mailing in Furtherance of Scheme

Defendants argue that the mailing of a dividend check cannot be a mailing made for the purpose of executing the fraudulent scheme. The elements of the offense of mail fraud under 18 U.S.C. § 1341 are:

(1) a scheme to defraud, and (2) the mailing of a letter, etc., *for the purpose of executing the scheme.*

*Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954) (emphasis added.) What constitutes a mailing "for the purpose of executing the scheme" has been a frequent subject of decision by the Supreme Court. *E. g., Kann v. United States,* 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944); *Parr v. United States,* 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960); *United States v. Sampson,* 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962); *United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974). In *United States v. Sampson,* 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962), a group of officers, directors, and employees of a nationwide corporation were accused of conspiracy and fraud by falsely promising to help businessmen obtain loans and sell their businesses while in reality making no effort to perform those services. After collecting an "advance fee" along with an application, defendants mailed an accepted application to their victims. Those mailings were the jurisdictional basis for the application of the mail fraud statute, but they were made after the money had been obtained. The Court concluded that the mailings lulled the victims into believing that their applications had been accepted and that the services promised would be performed. Because the mailings tended to conceal the fraud, the Court held that they were made for the purpose of executing the scheme.

In *United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), the Supreme Court refused to apply the mail fraud statute to the fraudulent use of a credit card at a variety of different motels. There the mailings charged were made by the motel operators to the bank that issued the credit card and from the bank to the rightful holder of the credit card. Although the Court found that the defendant had caused those mailings, it held that the mailings were not sufficiently closely related to the scheme to come within the statute. The scheme had already reached fruition when the defendant checked out of the

motels, and it was of no concern to the defendant whether the bank or the rightful holder bore the loss. In *Maze* the Court determined that the defendant would have preferred to have no mailings at all. Therefore the mailings could not be said to be for the purpose of executing the scheme. The Court distinguished *Maze* from *Sampson:*

> The subsequent mailings [in *Sampson* ] were designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place. But the successful completion of the mailings [in *Maze* ] from the motel owners to the Louisville bank increased the probability that respondent would be detected and apprehended.

*United States v. Maze,* 414 U.S. at 403, 94 S.Ct. at 650.

In our case, the defendants were convicted of conspiracy and mail fraud because of a dividend check mailed to Snell. As in *Sampson,* the mailing here, although made after the money was obtained, lulled Snell into believing that she was involved in a legitimate business enterprise. On an investment of $33,037, the receipt of no dividends at all would likely have aroused the suspicion of even this unusually trusting person. By paying instead a fraction of the dividend promised, the defendants hoped to conceal the fraudulent nature of the transaction.[5] The Supreme Court's language could have been written for our case as well:

> The subsequent mailings [of nominal dividends] were designed to lull [Snell] into a false sense of security, postpone [her] ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place.

414 U.S. at 403, 94 S.Ct. at 650. *See also United States v. Rauhoff,* 525 F.2d 1170,

---

**5.** There is also evidence that defendants used the fact of low dividends to attempt to convince Snell to purchase more stock so that she would receive higher dividends.

1176 (7th Cir. 1975), citing *United States v. Sampson.*[6]

In *Ohrynowicz v. United States*, 542 F.2d 715 (7th Cir.), *cert. denied*, 429 U.S. 1027, 97 S.Ct. 650, 50 L.Ed.2d 630 (1976), this court held that a mailing which was a normal concomitant of a transaction that was essential to the fraudulent scheme was made for the purpose of executing that scheme. There the defendant had conspired to defraud a number of banks in which he had opened checking accounts under false names and addresses. The checks used to defraud were nonpersonalized checks obtained on opening an account. The mailings charged were of personalized checks ordered by the defendant on opening a checking account but never actually used in the fraudulent transactions. The court found that ordering the personalized checks and hence causing them to be mailed was a normal concomitant of opening a checking account, a transaction that was essential to the fraudulent scheme. Not ordering the personalized checks, the court reasoned, could have alerted the bank to the fact that the account was being opened for illegitimate reasons. Our case may also be likened to *Ohrynowicz* because dividend payments are a normal concomitant of stock transactions. Here the mailing of a dividend check, however nominal, conveyed the impression of regularity and therefore made the transaction appear less suspect. *See United States v. Lea*, 618 F.2d 426, 430 (7th Cir. 1980) ("[A] mailing satisfies this requirement where it is a normal concomitant of a transaction that is essential to the fraudulent scheme."). On the basis of *United States v. Sampson* and the above-cited decisions of this court, we hold that the mailing of a dividend check to Snell was made for the purpose of executing the fraudulent scheme.

## III

Defendants assert that the trial judge made a variety of reversible errors during the course of trial. For the reasons discussed below, we do not agree.

It is argued that the dividend checks were improperly admitted because there was no showing that they were drawn or mailed by or at the direction of either defendant. Circumstantial evidence is of course sufficient to establish the authenticity of a document. The checks plainly showed that they were written on the account of the defendants' company, and the word "dividend" was typed on them. Defendant Clark himself testified that dividends were paid to Snell and that the amount advanced was as Snell testified. Phyliss Anderson, the defendants' employee whose signature appears on the checks, stated that she had issued each of the dividend checks and mailed at least some at the direction of the defendants. Clark conceded that Anderson was instructed to make out the checks. The final dividend check, which was the basis of defendants' conviction on the substantive count, arrived on August 26, one day after Clark told Snell that he would see why she had not yet received the latest dividend check. A dividend check dated August 24 and an envelope to Snell from defendants' company which was postmarked "Aug. 25 P.M." were admitted into evidence. Anderson testified that she made out the check and envelope and that she recalled mailing the envelope, all at the direction of the defendants. The dividend checks were unquestionably relevant when admitted and if their authenticity was not clearly established at that time, any error was cured by later evidence which overwhelmingly demonstrated that the checks were drawn and mailed by or at the direction of the defendants.

The contention that the Government's witness Edwin Medland was improperly allowed to testify lacks merit. Medland's report was included in the "open file" provided to the defendants prior to trial, and as the trial judge noted, his name appeared on the list of Government witnesses.

---

6. There is other evidence that defendants attempted to conceal their scheme and postpone Snell's complaint to the authorities. Snell was "cautioned" repeatedly not to call in a serviceman from any other company.

If defendants were nonetheless surprised, they could have sought a recess for the purpose of preparing to meet his testimony. No such request was made. The trial court did not err in admitting Medland's testimony.

Defendants assert that their counsel was unfairly prevented from questioning Snell about a civil suit filed against the defendants. The fact of the lawsuit was properly admitted on the issue of credibility, and defendant's counsel was permitted to question Snell about a deposition that she gave. The trial judge did not abuse his discretion when he prohibited counsel from questioning Snell as to the wording of a civil complaint signed by a lawyer, which complaint Snell had never seen.

Defendants also argue that it was reversible error to admit testimony by FBI agent Paul Milborn as to a statement made by defendant Denney after the conspiracy had ended. Milborn was asked, "Did Mr. Denney tell you how the checks that were paid to Mrs. Snell were delivered to her?" His response appears in the record, as "*She* said they were all mailed to her" (emphasis added). Even assuming that the response was understood by the jury as "*He* said they were all mailed to her," we find the admission, if error, to be harmless. Denney's statement would, of course, ordinarily be admissible under Rule 801(d)(2)(A) because it was an admission. Here defendants argue that the admission ran afoul of *United States v. Bruton*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), because it also incriminated defendant Clark and Denney did not testify. The problem with defendants' argument is that Clark himself made a similar admission. Milborn testified that Clark told him "[S]everal dividend checks were mailed to Mrs. Snell." The only difference in the two admissions is that Denney said (assuming we read the word "she" as "he") that "all" the checks were mailed while Clark said "several" were mailed. That difference becomes insignificant when it is recognized that the jury did not find defendants guilty of mailing all the dividend checks. In fact, de-

fendants were acquitted on all but one count of mailing a dividend check. Because the jury believed beyond a reasonable doubt only that one dividend check was mailed, and because both coconspirators made admissions that dividend checks were mailed, Clark cannot claim to be prejudiced by Denney's admission. *United States v. Fleming*, 594 F.2d 598, 603–04 (7th Cir.), *cert. denied*, 442 U.S. 931, 99 S.Ct. 2863, 61 L.Ed.2d 299 (1979); *United States v. Spinks*, 470 F.2d 64, 66 (7th Cir.), *cert. denied*, 409 U.S. 1011, 93 S.Ct. 456, 34 L.Ed.2d 305 (1972). This is especially true in a case where as here there was substantial independent evidence of the mailing, *e. g.*, the dated check, postmarked envelope, and Snell and Anderson's testimony. *Id.*

Finally, defendants' motion for a judgment of acquittal at the close of the Government's case-in-chief was properly denied. This was not a case in which a reasonable juror could conclude only that the defendants were "puffing." Sufficient evidence was adduced from which the jury could find as it did that the defendants had conceived and perpetrated a scheme to defraud Snell *of substantial sums of money on the basis of false and fraudulent representations.*

AFFIRMED.